

**FILED**

*3:41 pm, 11/13/25*

**Margaret Botkins**
**Clerk of Court**

William E. Sparks
JONES WALKER LLP
Wyoming Bar No. 6-4501
10001 Woodloch Forest Drive, Ste. 350
The Woodlands, TX 77380
Telephone: (281) 296-4552
Facsimile: (281) 296-4575
wsparks@joneswalker.com

## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF WYOMING

OVINTIV INC.,

    Petitioner,

vs.

U.S.   BUREAU   OF   LAND
MANAGEMENT, U.S. DEPARTMENT
OF   THE   INTERIOR,   and   ALFRED
ELSER,   in his official capacity as the
Wyoming Deputy State Director for the
Wyoming Bureau of Land Management,

    Respondents.

CASE NO.:    25-CV-264

## ORIGINAL PETITION FOR REVIEW

### I.    INTRODUCTION

1.    Ovintiv Inc. ("Ovintiv") files this Original Petition for Review ("Petition") against the final decisions of the U.S. Bureau of Land Management ("BLM").

2.    In this action, Ovintiv seeks review of the final decisions of BLM, including the Incidents of Noncompliance issued by the BLM Casper Field Office ("CFO"), i.e., Incidents of Noncompliance numbers 24AST0001I, 24AST0002I, 24AST0003I, and 24AST0004I (collectively the "INCs"); BLM's Written Orders of the Authorized Officer, 23PG0013W,

23PG0021W, 23PG0026W, 23PG0035W (collectively the "Written Orders"); and the Wyoming BLM Deputy State Director's Decision issued August 15, 2025 ("SDR Decision"), a decision of an administrative appeal of the BLM Casper Field Office's issuance of the INCs.

3.    The INCs relate to the plugging and abandonment of the Burke Ranch #9-17, Burke Ranch #5, Burke Ranch #7, and Burke Ranch #9 oil and gas wells (collectively the "Wells"), drilled by various operators within the Burke Ranch Unit WYW-109445X on federal oil and gas leases WYW-100546, WYW-002118, WYW-002046, and WYC-081317B (collectively the "Leases").

4.    Ovintiv files this Petition against the INCs, Written Orders, and the SDR Decision because, among other reasons,

a.    The INCs wrongfully state that Ovintiv is an operator/third party of the Wells.

b.    The INCs and SDR Decision are contrary to the Mineral Leasing Act ("MLA"), BLM's regulations, Instruction Memorandum, and other guidance because Ovintiv never owned any interests in the Leases or Wells.

c.    BLM's regulations are contrary to the MLA and do not provide for successor liability for corporate acquisition of entities that may have previously owned federal leases.

d.    BLM's regulations do not require Ovintiv to plug and abandon the Wells because the obligation to plug did not "accrue" at the time that BLM alleges that Ovintiv's predecessor owned an interest in the Wells and Leases.

e.    The INCs, Written Orders, and the SDR Decision are arbitrary and capricious considering BLM's obligations to seek relief from the last owners of operating

2

rights and record title prior to seeking relief for those that have not owned any interest—or received any benefit—from the Lease and Wells.

f.  BLM has not established that Ovintiv is currently responsible for the Wells.

g.  BLM failed to ensure proper bonding from the operator, current record title owners, and operating rights owners to ensure plugging and abandonment of the Wells.

h.  Even if Ovintiv was obligated to plug and abandon the Wells, it has no lease or contractual rights to access the private surface of the lands and would be in trespass if it attempted to access the Wells.

i.  The Leases do not provide that Ovintiv, as an alleged previous owner of the Leases is liable for current plugging, abandonment, and reclamation regardless of the current BLM regulations.

## II.    PARTIES

5.    Petitioner, Ovintiv, is a Delaware corporation with its principal place of business in Denver, Colorado. Ovintiv is an independent oil and gas exploration and development company but no longer has any active oil and gas operations in Wyoming.

6.    Respondent U.S. Bureau of Land Management ("BLM") is a bureau within the U.S. Department of the Interior. The Secretary of the Interior ("Secretary") has delegated to BLM the responsibility for managing public lands, federal oil and gas wells, and mineral resources owned by the United States.

7.    Respondent U.S. Department of the Interior ("Interior") is a federal agency of the United States of America responsible for administering mineral resources, including oil and gas, owned by the United States.

8.    Respondent Alfred Elser, is the Wyoming Deputy State Director for Minerals and Lands and is named in his official capacity.  Mr. Elser signed the SDR Decision.

### III.    JURISDICTION AND VENUE

9.    This Court has jurisdiction under the federal question doctrine under 28 U.S.C. § 1331 because this case involves federal statutes, federal regulations, the regulation of federal oil and gas wells, and the Respondents are U.S. Government agencies and bureaus.

10.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to this action occurred in Wyoming, and the property at issue (the oil and gas wells) are located in Wyoming.

### IV.    FACTUAL BACKGROUND

*A.  History of the Leases*

11.    BLM issued the Leases in the early 1950s, and they do not have all of the provisions of a modern federal oil and gas lease, but include a provision regarding it being subject to future oil and gas lease regulations "when not inconsistent with any express or specific provisions" of the Leases.

12.    There have been numerous changes in the record title owners, operating rights owners, and operators of the Wells and Leases over the past approximately 75 years.  According to BLM's records, however, Ovintiv has never operated nor owned any interest in the Wells and never owned any interest in the Leases.

13.    Of relevance here, on May 4, 1988, BLM approved an assignment of record title from Exxon Corporation to McMurry Oil Company ("McMurry Oil").

14.    On March 13, 2000, BLM approved an assignment of 100% of the record title from McMurry Oil to Wyoming Oil & Gas, Minerals, Inc. ("WOGM"). Thus, on March 14, 2000,

4

McMurry Oil owned no interest in the Leases or Wells. At this time, McMurry Oil could not convey any interest in any of the Leases.

15.    AEC Oil and Gas (USA) Inc. ("AEC") acquired McMurry Oil from McMurry Energy Company ("MEC") on May 1, 2000.  Under the Stock Purchase and Sale Agreement between AEC and MEC, AEC obtained no interests in the Leases or Wells.  Importantly, McMurry Oil did not own the Leases when AEC acquired it.  As part of this transaction, MEC expressly retained all liability related to any of the leases that McMurry Oil previously owned, including the Leases and Wells at issue in this case.  Thus, when AEC acquired McMurry Oil, it did not acquire any interest in the Leases and Wells, and did not assume any liability related to them.

16.    According to BLM, MEC is the parent company of McMurray Oil and owner that retained liability for the Leases and Wells, and eventually became Shell Rocky Mountain Production LLC, which is now SWEPI, LP.

17.    In 2000, WOGM assigned all interest in the Leases to Manx Oil Corporation ("Manx"). Through various other BLM approved assignments, involving Manx, Corkill Drilling Corporation, Hot Springs Resources, Ltd, and Terex Energy Corp. ("Terex"), Terex obtained all of the record title and operating rights in the Leases and was the BLM-designated operator of the Wells with surface access through its private agreement with the surface owner.  As of 2019, Terex owned the record title and operating rights of the Leases and all interest in the Wells.

18.    Nowhere in the chain of title for the Leases does Ovintiv appear. Ovintiv never owned any interest in the Leases or Wells and was never the designated operator of the Wells.

19.    Based on information and belief, all of the Leases terminated under their own terms.

OVINTIV ORIGINAL PETITION
#110085652v7

B. *Terex Fails to Comply with BLM's Orders for the Wells*

20.    Terex and several other entities—not Ovintiv—operated the Wells and Leases under the Burke Ranch Unit and agreed to be comply with the terms of the Leases through the Unit and Unit Operating Agreement.

21.    Based on information and belief, BLM did not require adequate lease or well bonding from Terex and has not utilized its bonds to cover the current plugging, abandonment, and reclamation of the Wells.

22.    Based on information and belief, the current operator and owners of the Wells and Leases, Terex, failed to comply with its obligations under the terms of the Leases, the MLA, the Unit Agreement, the Unit Operating Agreement, and BLM regulations.

23.    Based on information and belief, BLM may have attempted to force the current operator and owners of the Wells and Leases, Terex, to comply with its obligations under the terms of the Leases, the MLA, and BLM regulations, but BLM failed to ensure compliance from Terex.

24.    Based on information and belief, after BLM could not obtain compliance by Terex, it attempted to seek compliance from those it believed may have previously owned an interest in the Leases and Wells, including Ovintiv.

25.    BLM issued the Written Orders (23PG0013W, 23PG0021W, 23PG0026W, 23PG0035W) on December 7, 2022 to Ovintiv, who BLM believes is a former record title owner and operating rights owners of the Leases.

26.    BLM issued several Notices of Incidents of Noncompliance in October 2023 to Ovintiv, who BLM believes is a former record title owner and operating rights owners of the Wells and Leases.

6

a. BLM issued INC No. 24AST0001I for the Burke Ranch #9-17 well related to Lease WYW02118.

b. BLM issued INC No. 24AST0002I for the Burke Ranch #7 well on Lease WYW100546.

c. BLM issued INC No. 24AST0003I for the Burke Ranch #9 well on Lease WYW02046.

d. BLM issued INC No. 24AST0004I for the Burke Ranch #5 well on Lease WYW081317B.

27. The previous owners and operators of the Wells executed a Surface Use Agreement with the surface owner. This surface access agreement since terminated under its own terms.

28. Ovintiv never owned or obtained any interests in the Surface Use Agreement allowing access to the Wells.

*C. Decisions and Final Agency Actions Challenged*

29. On December 7, 2022, BLM issued the Written Orders regarding the Wells drilled by various operators within the Burke Ranch Unit WYW-109445X.

30. In response to the Written Orders, Ovintiv filed a state director review under 43 C.F.R. § 3165.3(b) so that it could provide additional documentation to BLM regarding any potential liability for the Wells.

31. Ovintiv subsequently determined that it did not—and has never—owned any interests in the Wells and requested an extension regarding plugging and abandonment of the Wells BLM never responded to this extension request.

32. On or about October 23, 2023, Ovintiv received the INCs and filed another request for SDR on November 14, 2023.

OVINTIV ORIGINAL PETITION
#110085652v7

33.    BLM denied Ovintiv's SDR and issued the SDR Decision (amending a previous decision) on August 15, 2025.  BLM provided no basis in the Written Orders or INCs to impose liability on Ovintiv, other than BLM's regulations that are inconsistent with the MLA.

34.    The Written Orders, INCs, SDR Decision, and BLM's regulations in Code 43 Part 3000 all constitute final agency actions subject to judicial review.

## V.    STATUTORY AND REGULATORY BACKGROUND

### A.    *APA – Standard of Review*

35.    The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

36.    Under the APA, BLM's regulations and decisions are arbitrary and capricious if BLM (1) "entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *Am. Wild Horse Campaign v. Raby*, 144 F.4th 1178, 1188 (10th Cir. 2025) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)) (internal quotations omitted).

37.    The APA authorizes reviewing courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

### B.  *Mineral Leasing Act*

38.    The Mineral Leasing Act, provides in pertinent part:

8

Notwithstanding anything to the contrary in section 187 of this title, any oil or gas lease issued under the authority of this chapter may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary and as to either a divided or undivided interest therein, to any person or persons qualified to own a lease under this chapter, and any assignment or sublease shall take effect as of the first day of the lease month following the date of filing in the proper land office of three original executed counterparts thereof together with any required bond and proof of the qualification under this chapter of the assignee or sublessee to take or hold such lease or interest therein. Until such approval, however, the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed . . . 30 U.S.C. § 187a (emphasis added).

39.     The MLA further states:

Upon approval of any assignment or sublease, the assignee or sublessee shall be bound by the terms of the lease to the same extent as if such assignee or sublessee were the original lessee, any conditions in the assignment or sublease to the contrary notwithstanding. Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands; and such segregated leases shall continue in full force and effect for the primary term of the original lease, but for not less than two years after the date of discovery of oil or gas in paying quantities upon any other segregated portion of the lands originally subject to such lease. . . . 30 U.S.C. § 187a (emphasis added)

40.     The MLA contains no provision regarding the retention of liability for previous record title owners and operating rights owners after BLM approves an assignment to a new qualified lessee or operating rights owner. 30 U.S.C. § 187a.

41.     The MLA contains no provision regarding the acquisition of an entity or assumption of liability of federal oil and gas leases upon the acquisition of an entity that once owned federal oil and gas leases or wells. 30 U.S.C. § 187a.

42.     The MLA prescribes the Secretary to issues regulations to carry out the purposes of the MLA. 30 U.S.C. § 189.  BLM has issued regulations in Title 43 of the Code of Federal Regulations.

43.     Under 30 U.S.C. § 187b of the MLA, if a lessee submits a written relinquishment of a federal oil and gas lease, such lessee shall remain liable for obligations under a lease. There is no similar MLA provision regarding liability for lease obligations after lease assignments.

## C. BLM Regulations

44.     BLM's regulation at 43 C.F.R. § 3100.5 defines "record title" as:

a lessee's interest in a lease, which includes the obligation to pay rent and the ability to assign and relinquish the lease. Record title includes the obligation to comply with the lease terms, including requirements relating to well operations and abandonment. Overriding royalty and operating rights are severable from record title interests.

45.     BLM's regulation at 43 C.F.R. § 3100.5 defines "lessee" as "a person holding record title in a lease issued by the United States."

46.     BLM's regulation at 43 C.F.R. § 3100.5 defines "operating right (working interest)" as:

the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including production of oil or gas from such lands in accordance with the terms of the lease. Operating rights include the obligation to comply with the terms of the original lease, as it applies to the area or horizons for the interest acquired, including the responsibility to plug and abandon all wells that are no longer capable of producing, reclaim the lease site, and remedy environmental problems.

47.     BLM's regulation at 43 C.F.R. § 3100.5 defines "Operator" as "any person, including, but not limited to, the lessee or operating rights owner, who has stated in writing to the authorized officer that it is responsible under the terms and conditions of the lease for the operations conducted on the leased lands or a portion thereof."

48.     The BLM regulation 43 C.F.R. § 3106.6-1 (2023) requires that record title owners and operating rights owners maintain an adequate lease bond.

49.     BLM will not approve the transfer of interests in oil and gas leases (record title or operating rights) unless there is an adequate bond in place. 43 C.F.R. § 3106.7-1 (2023).  BLM's 2024 regulations regarding bonds in 43 C.F.R. Subpart 3104 are substantially similar.

50.     The BLM's regulation 43 C.F.R. § 3106.7–2 from 2023 states:

If I transfer my lease, what is my continuing obligation?

(a) You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights.
(b) After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer. 43 C.F.R. § 3106.7–2 (2023).

51.     The BLM's regulation 43 C.F.R. § 3106.7-6 from 2023 states:

If I acquire a lease by an assignment or transfer, what obligations do I agree to assume?

(a) If you acquire record title interest in a Federal lease, you agree to comply with the terms of the original lease during your lease tenure. You assume the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time. You must also maintain an adequate bond to ensure performance of these responsibilities.

(b) If you acquire operating rights in a Federal lease, you agree to comply with the terms of the original lease as it applies to the area or horizons in which you acquired rights. You must plug and abandon all unplugged wells, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time you receive the transfer. You must also maintain an adequate bond to ensure performance of these responsibilities. 43 C.F.R. § 3106.7-6 (2023).

52.     BLM updated its regulations in 2024.  Section 43 C.F.R. § 3106.72 (2024) now states:

Continuing obligation of an assignor or transferor

OVINTIV ORIGINAL PETITION
#110085652v7

(a) The lessee or sublessee remains responsible for performing all obligations under the lease until the date the BLM approves an assignment of record title interest or transfer of operating rights.

(b) After the BLM approves the assignment or transfer, the assignor or transferor will continue to be responsible for lease obligations that accrued before the approval date, whether or not such obligations were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer.  43 C.F.R. § 3106.72 (2024).

53.    BLM's regulations in Code 43 Part 3000 contain no provision regarding the acquisition of an entity or assumption of liability of federal oil and gas leases upon the acquisition of an entity that once owned federal oil and gas leases.

## VI.    CAUSES OF ACTION

### Cause 1: The MLA and BLM's Regulations are Contrary to Law and Do Not Impose Liability on Ovintiv

54.    Ovintiv incorporates the foregoing paragraphs as though fully set forth herein.

55.    The MLA, 30 U.S.C. § 187a, contains no provisions regarding the retention of liability for previous record title owners and operating rights owners after an assignment is made, the acquisition of an entity or assumption of liability of federal oil and gas leases, or that accrual of plugging obligation occurs as of the date a well is drilled.

56.    However, BLM's regulations at 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7-2(b) (2023) provide that after the Secretary, through BLM, approves an assignment or transfer, "the assignor or transferor will continue to be responsible for lease obligations that accrued before the approval date whether or not such obligations were identified at the time of the assignment or transfer." These regulations further define such lease obligations that "accrued before the approval date" to include "responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer."

12

57.     BLM's application and interpretation of 30 U.S.C. § 187a to impose on an assignor or transferor of a federal oil and gas lease responsibility for plugging and abandoning a well that continued production after the approval date, as reflected in 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7-2(b) (2023), is not consistent with the MLA, exceed BLM's authority under the MLA, are invalid, arbitrary, capricious, and contrary to law.

58.     BLM's application and interpretation of 30 U.S.C. § 187a to impose on an entity that acquired an entity that may have owned an interest in a federal oil and gas lease the responsibility for plugging, abandoning, and reclamation of a well is not consistent with the MLA, exceed BLM's authority under the MLA, and are arbitrary, capricious, and contrary to law.

59.     BLM's application and interpretation of 30 U.S.C. § 187a to impose the responsibility for plugging, abandoning, and reclaiming of a well—and treating these obligations as "accrued" once the well is drilled—before the assignment of record title is not consistent with the MLA, exceeds BLM's authority under the MLA, is invalid, arbitrary, capricious, and contrary to law.

60.     Because BLM's regulations, 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7-2(b) (2023), are contrary to law, BLM's issuance of the INCs, Written Orders, and SDR Decision that rely on BLM's regulations are arbitrary, capricious, and not in accordance with law.

**Cause 2: BLM's Written Orders, INCs, and SDR Decision are Arbitrary, Capricious, and Not in Accordance with the Law**

61.     Ovintiv incorporates the foregoing paragraphs as though fully set forth herein.

62.     Ovintiv never operated the Wells and never owned any interest in the Leases (record title or operating rights) or in the Wells.

63.     Ovintiv does not dispute that AEC acquired McMurry Oil from MEC on May 1, 2000.  However, prior to this transaction, BLM expressly approved the assignment of the Leases

13

from McMurry Oil to WOGM on March 13, 2000, nearly two months prior to AEC's acquisition of McMurry Oil.

64.     At the time that AEC acquired McMurray Oil from MEC, McMurray Oil owned no interest (record title or operating rights) in the Leases. At the time of AEC's acquisition, McMurray Oil owned no interest in the Wells.

65.     When AEC acquired McMurry Oil from MEC, MEC retained all liability for the Leases and Wells. Based on information and belief, MEC eventually became Shell Rocky Mountain Production LLC which is now SWEPI, LP.

66.     BLM's application of 43 C.F.R. § 3106.7-2(b) to impose liability on Ovintiv for plugging, abandoning, and reclaiming of the Wells— which continued production after the date of BLM's approval of the assignment of from McMurry Oil to MOGC—is arbitrary, capricious, and contrary to law.

67.     BLM's conclusion that, even after the Secretary approved the transfers of all of McMurray Oil's interests in the Wells and Leases, Ovintiv's predecessors have continuing liability for the plugging, abandonment, and reclaiming the Wells is inconsistent with Section 187a of the MLA and is therefore arbitrary, capricious, and contrary to law.

68.     BLM's implementation and application of 43 C.F.R. § 3106.7-2(b) (2023) to find that responsibility for plugging and abandoning the Wells accrued before the date of the Secretary's approval of the assignment from McMurray Oil to MOGC is arbitrary and capricious.

69.     The MLA imposes no obligations on an entity that acquires another entity that may have owned an interest in a federal oil and gas lease at some point.  Prior to the acquisition of McMurray, AEC expressly ensured that it was not acquiring an entity that owned an interest in the Wells or Leases.

70.     Accordingly, the INCs, Written Orders and SDR Decision are arbitrary, capricious, and not in accordance with law.

**Cause 3: BLM's Decisions are Arbitrary, Capricious, and Contrary to Law Because BLM Failed to Ensure Adequate Bonding from the Current Operator and Owners of the Leases, BLM's Remedies are Against the Current and Most Recent Owners of the Wells, and Ovintiv Has No Right of Access to the Wells**

71.     Ovintiv incorporates the foregoing paragraphs as though fully set forth herein.

72.     Under 43 C.F.R. § 3106.7-1 (2023) and 43 C.F.R. § 3106.20 (2024), prior to approval of record title, operating rights, or a new operator, BLM is required to ensure that there is sufficient bonding to cover issues related to wells and subsequent operations, including plugging and abandonment.

73.     BLM failed to ensure proper bonding from the operator, current record title owners, and operating owners to ensure plugging and abandonment of the Wells on the Leases.

74.     BLM decisions (including the INCs, Written Orders, and the SDR Decision) are also arbitrary and capricious in light of BLM's obligations to seek relief from the last owners of operating rights and record title prior to seeking relief for those that have not owned any interest—nor received any benefit—from the Wells.

75.     Ovintiv, nor its predecessor, obtained any rights to the surface of the Leases and lands on which the Wells are located, and it has no lease or contractual rights to access the private surface of the lands.  Ovintiv would be in trespass if it attempted to access the Wells.

76.     Accordingly, BLM's issuance of the INCs, Written Orders, and SDR Decision requiring Ovintiv to trespass are arbitrary, capricious, and not in accordance with law.

## VII.    PRAYER

Ovintiv prays and respectfully requests the entry of a final judgment against Respondents, that includes:

OVINTIV ORIGINAL PETITION
#110085652v7

1.      A declaration that BLM's regulations, 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7-2(b) (2023), are invalid, exceed the statutory authority provided by the MLA, and violate the APA as arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction.

2.      Vacate and set aside 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7-2(b) (2023) to the extent they impose liability and responsibility on previous record title and operating rights owners to plug and abandon oil and gas wells in which they own no interest.

3.      A declaration that Ovintiv is not liable under the Written Orders, INCs, or SDR Decision because these final agency actions violate the APA as arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction.

4.      A declaration that Ovintiv is not required to plug, abandon, and reclaim the Burke Ranch #9-17, Burke Ranch #5, Burke Ranch #7, and Burke Ranch #9 oil and gas wells as required by the Written Orders, INCs, or SDR Decision.

5.      Vacate and set aside the Written Orders, INCs, or SDR Decision because they violate the APA as arbitrary, capricious, and not in accordance with law.

6.      Enjoin Respondents from enforcing the Written Orders, INCs, or SDR Decision or pursuing enforcement or penalties against Ovintiv related to the Burke Ranch #9-17, Burke Ranch #5, Burke Ranch #7, and Burke Ranch #9 oil and gas wells.

7.      Award Ovintiv its reasonable attorneys' fees and costs allowed by law including 28 U.S.C. § 2412.

8.      Ovintiv further prays that the Court grant any and all additional relief to which it may show itself justly entitled, whether at law or in equity.

16

Dated: November 13, 2025.                    Respectfully submitted,

                                             **JONES WALKER LLP**


                                             WILLIAM E. SPARKS
                                             Wyoming Bar No. 6-4501
                                             10001 Woodloch Forest Drive, Ste. 350
                                             The Woodlands, TX 77380
                                             Telephone: (281) 296-4552
                                             Facsimile: (281) 296-4575
                                             wsparks@joneswalker.com

                                             *Attorney for Ovintiv Inc.*

17