William E. Sparks
JONES WALKER LLP
Wyoming Bar No. 6-4501
10001 Woodloch Forest Drive, Ste. 350
The Woodlands, TX 77380
Telephone: (281) 296-4552
Facsimile: (281) 296-4575
wsparks@joneswalker.com

## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF WYOMING

| | |
|---|---|
| OVINTIV INC.,<br><br>        Petitioner,<br><br>vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR, and ALFRED ELSER, in his official capacity as the Wyoming Deputy State Director for the Wyoming Bureau of Land Management,<br><br>        Respondents. | CASE NO.: 1:25-cv-00264-SWS |

## PETITIONER OVINTIV USA INC.'S OPENING BRIEF

*Oral Argument Requested*

#112068292v12

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INDEX OF TERMS & GLOSSARY ....................................................................................... vii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF THE CASE.................................................................................................. 2

    I.    Factual Background ................................................................................................... 3

        A.    History of the Leases ......................................................................................... 3

        B.    Corporate History of Ovintiv USA Inc. ............................................................ 4

    II.    Procedural History ................................................................................................... 5

        A.    BLM's Written Orders and INCs........................................................................ 5

        B.    State Director Review of the INCs ..................................................................... 7

LEGAL FRAMEWORK ........................................................................................................... 8

    I.    Statutory Law: The Mineral Leasing Act ............................................................ 8

    II.    Regulatory Law: 43 C.F.R. § 3106, *et seq*. ........................................................... 9

        A.    The 1982 and 1988 Regulations: Consistent with the MLA......................... 10

        B.    The 2001 Regulations: BLM Changes Decades of Regulatory Consistency .............. 11

        C.    The 2024 Regulations: In Effect Today, But Not Applicable .................................... 13

STANDARD OF REVIEW ..................................................................................................... 14

ARGUMENT........................................................................................................................... 16

    I.    Neither the MLA Nor BLM's Regulations Substantiate Ovintiv's Liability as a Non-Lessee................................................................................................................................... 16

        A.    Ovintiv Never Acquired Record Title or Any Other Interest in the Leases ................. 17

        B.    Neither the MLA Nor BLM's Regulations Extend Lease Liability Based on Corporate Lineage................................................................................................................................... 19

        C.    BLM Precedent and Guidance Does Not Support Lease Liability Based on Corporate Lineage................................................................................................................................... 21

    II.    General Principles of Corporate Successor Liability Do Not Support Ovintiv's Liability................................................................................................................................... 23

        A.    General Principles of Corporate Liability...................................................................... 24

        B.    Ovintiv Did Not Assume Liability Under the Leases When AEC Acquired McMurry Oil  25

        C.    Chain of Title Follows the Leases to Terex, Not the Entity ......................................... 31

    III.    Ovintiv Did Not Accrue Continuing Plugging, Abandonment, or Reclamation Obligations Under the MLA and BLM Regulations................................................................. 32

i

A.    BLM's Regulations Exceed Its Authority Under the MLA, and Lessees Do Not Retain "Accrued" Liability After A BLM-Approved Assignment ................................................... 33

B.    Lease Liability Does Not "Accrue" When a Well is Drilled ....................................... 36

IV.    Ovintiv Lacked Fair Notice that it Could Face Liability Under the Leases ................. 36

V.    The SDR Decision, INCs, and Written Orders Are Arbitrary and Capricious. ................ 40

A.    BLM Failed to Engage in Reasoned Decisionmaking ................................................... 40

B.    BLM Failed To Pursue Relief From Prior Lessees and Operators .............................. 42

C.    BLM Failed To Ensure Adequate Bond Coverage ....................................................... 43

D.    Compliance with BLM's Written Orders and INCs Would Require Ovintiv to Commit Trespass ..................................................................................................................... 44

CONCLUSION ............................................................................................................................... 45

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv. v. NLRB*,
   522 U.S. 359 (1998).........................................................................................................15

*Aspenwood Inv. Co. v. Martinez*,
   355 F.3d 1256 (10th Cir. 2004) .......................................................................................20

*Baxter v. Grand Lodge of the Indep. Ord. of Odd Fellows of Colo.*,
   No. 24-cv-00984-GPG-MDB, 2025 U.S. Dist. LEXIS 106482 (D. Colo. 2025)....................25

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)...................................................................................................31, 37

*Cascade Energy & Metals Corp. v. Banks*,
   896 F.2d 1557 (10th Cir. 1990) ..................................................................................24, 29

*Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.*,
   176 F. Supp. 2d 1091 (D. Colo. 2001).............................................................................25

*Colorado Envtl. Coalition v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) .......................................................................................39

*Cyprus Amax Minerals Co. v. TCI Pac. Communs., LLC*,
   28 F.4th 996 (10th Cir. 2022) .........................................................................................24

*De Niz Robles v. Lynch*,
   803 F.3d 1165 (10th Cir. 2015) .......................................................................................37

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)........................................................................................................31

*Frank v. U.S. West, Inc.*,
   3 F.3d 1357 (10th Cir. 1993) ...........................................................................................23

*General Electric Co. v. U.S.E.P.A.*,
   53 F.3d 1324 (D.C. Cir. 1995).........................................................................................36

*Gutierrez-Brizuela v. Lynch*,
   834 F.3d 1142 (10th Cir. 2016) .......................................................................................37

*Hays Med. Ctr. v. Azar*,
   956 F.3d 1247 (10th Cir. 2020) .......................................................................................18

#112068292v12

*Jewell v. United States*,
749 F.3d 1295 (10th Cir. 2014) ................................................................................................9

*Kisor v. Wilkie*,
588 U.S. 558 (2019)..........................................................................................14, 15, 35

*Kansas ex rel. Kobach v. United States DOI*,
72 F.4th 1107 (10th Cir. 2023) ...........................................................15, 24, 29, 35

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)...................................................................................... *passim*

*Luckett v. Bethlehem Steel Corp.*,
618 F.2d 1373 (10th Cir. 1980) ...........................................................................24

*Monahan v. U.S. Dep't of Interior*,
No. 05-8068, 2007 U.S. App. LEXIS 24211 (10th Cir. Oct. 15, 2007) ...................................42

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................................................................................................15

*NLRB v. Greater Kan. City Roofing*,
2 F.3d 1047 (10th Cir. 1993) .................................................................23, 24, 28, 29

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ...........................................................14, 17, 18, 40

*Quarles v. Fuqua Indus., Inc.*,
504 F.2d 1358 (10th Cir. 1974) ...........................................................................24, 28

*Qwest Corp. v. FCC*,
258 F.3d 1191 (10th Cir. 2001) ...........................................................................39, 40

*River Gas Corp. v. Pullman*,
960 F. Supp. 264 (D. Utah 1997).........................................................................23

*SSP Partners v. Gladstrong Invs. Corp.*,
275 S.W.3d 444 (Tex. 2008)..................................................................................23

*State v. United States DOI*,
493 F. Supp. 3d 1046 (D. Wyo. 2020)...............................................................14, 31

*United States v. Bestfoods*,
524 U.S. 51 (1998)...................................................................................24, 28, 29

*United States v. Magnesium Corp. of America*,
616 F.3d 1129 (10th Cir. 2010) ...........................................................................36

iv

*Usery v. Kennecott Copper Corp.*,
577 F.2d 1113 (10th Cir. 1977) ........................................................................36, 38

*Utahns v. United States DOT*,
305 F.3d 1152 (10th Cir. 2002) ...............................................................................39

*W. Watersheds Project v. Interior Bd. of Land Appeals*,
62 F.4th 1293 (10th Cir. 2023) ................................................................................41

*Walker Stone Co. v. Secretary of Labor*,
156 F.3d 1076 (10th Cir. 1998) ........................................................................36, 39

*WildEarth Guardians v. U.S. Fish and Wildlife Serv.*,
784 F.3d 677 (10th Cir. 2015) .........................................................................31, 35

*Wyoming v. United States DOI*,
136 F. Supp. 3d 1317 (D. Wyo. 2015)......................................................................34

*Wyoming v. United States DOI*,
2024 U.S. Dist. LEXIS 235015 (10th Cir. 2024)........................................................9

**Statutes**

5 U.S.C. § 706.............................................................................................. *passim*

30 U.S.C. § 187a........................................................................................... *passim*

30 U.S.C. § 189.......................................................................................................9, 31

**Other Authorities**

43 C.F.R. § 3100.0-5................................................................................................17

43 C.F.R. § 3106.1 ..................................................................................................17

43 C.F.R. § 3106.7-1................................................................................................42

43 C.F.R. § 3106.7-2................................................................................. *passim*

43 C.F.R. § 3106.72................................................................................7, 16, 19

43 C.F.R. § 3106.7-6..........................................................................6, 12, 16, 19

43 C.F.R. § 3106.76................................................................................................13

43 C.F.R. § 3106.8-3..........................................................................18, 19, 20

43 C.F.R. § 3162.3-4................................................................................................35

v

47 Fed. Reg. 28563 (June 30, 1982) ........................................................................................10

52 Fed. Reg. 22596 (June 12, 1987) ...........................................................................11, 37, 38

53 Fed. Reg. 17347 (May 16, 1988) ....................................................................................33, 38

63 Fed. Reg. 1936 (Jan. 13. 1998) .........................................................................................33

66 Fed. Reg. 1883 (Jan. 10, 2001) ................................................................................... *passim*

89 Fed. Reg. 30942 (Apr. 23, 2024) ......................................................................................13

**Interior Board of Land Appeals Cases**

*Apache Corp*., IBLA 2017-65 (Dec. 6, 2021) ..................................................................21, 23, 40

*Beren Corporation*, IBLA 2021-205 (Dec. 17, 2021) ..................................................................23

*Petroleum, Inc., Frank H. Gower Trust & Rex Monahan*, 161 IBLA 194 (2004) ........................41

*Pitch Energy Corp.*, 169 IBLA 267 (2006) ...................................................................................41

*Ralph G. Abbott*,115 IBLA 343 (1990) .........................................................................................41

#112068292v12

## INDEX OF TERMS & GLOSSARY

| | |
|---|---|
| AEC | AEC Oil and Gas (USA) Inc. |
| Alberta Energy | Alberta Energy Company, Ltd. |
| BLM | Bureau of Land Management |
| EnCana | EnCana Oil & Gas (USA) Inc. |
| INCs | Notices of Incidents of Noncompliance Nos. 24AST0001I, 24AST0002I, 24AST0003I, and 24AST0004I. |
| McMurry Oil | McMurry Oil Company |
| McMurry SPA | Stock Purchase Agreement between AEC Oil and Gas (USA) Inc. and McMurry Oil Company (May 1, 2000) |
| MEC | McMurry Energy Corporation |
| MLA | Mineral Leasing Act, 30 U.S.C. 181, et seq. |
| Leases | Federal oil and gas leases WYW-100546, WYW-002118, WYW-002046, and WYC-081317B |
| Lessee | Defined in 43 C.F.R.§ 3160.0-5 (2000) |
| ORO | Operating Rights Owner, as defined in 43 C.F.R. 3100.0-5 (2000) |
| Ovintiv | Ovintiv USA Inc. (recipient of the Written Orders, INCs, and SDR Decision) |
| Ovintiv Inc. | Ovintiv Inc. (corporate parent of Ovintiv USA Inc.) |
| RTO | Record Title Owner, as defined in 43 C.F.R. 3100.0-5 (2000) |
| SDR Decision | BLM State Director Decision, Change 1 (August 15, 2025) |
| Wells | Burke Ranch #9-17, Burke Ranch #5, Burke Ranch #7, and Burke Ranch #9 wells |

#112068292v12

viii

Written Orders              Written Orders No. 23PG0013W, 23PG0021W, 23PG0026W, and

                            23PG0035W.

#112068292v12

**INTRODUCTION**

Liability for plugging, abandonment, and reclamation obligations under federal oil and gas leases follows the lease interests themselves. Ovintiv USA Inc. ("Ovintiv") has never owned record title or operating rights in the Leases at issue, has never served as the designated operator of the Wells, and has never held any contractual or regulatory obligations arising from those Leases. Under the plain language of the Leases, the Mineral Leasing Act ("MLA"), and BLM's regulations, Ovintiv never acquired or assumed liability for wells drilled, operated, and ultimately abandoned by other entities on the Leases, including Terex Energy Corp. ("Terex").

Through the Incidents of Noncompliance ("INCs") and Written Orders (collectively "Orders"), upheld by BLM's State Director Review Decision ("SDR Decision"), BLM seeks to impose lease obligations on a company that never owned an interest in the Leases. In doing so, BLM departs from the statutory and regulatory framework governing federal oil and gas leases and exceeds the authority granted to it under the MLA. Neither the MLA, BLM's regulations, nor any applicable agency guidance authorizes BLM to impose lease liability on an entity based solely on corporate lineage where that entity never held any interests in the relevant Leases. BLM's application and interpretation of its regulations exceed the statutory authority of the MLA and are contrary to law.

As explained more fully below, the Orders are arbitrary, capricious, contrary to law, and in excess of BLM's statutory authority because: (1) the Written Orders and INCs incorrectly identify Ovintiv as an operator or responsible third party with respect to the Wells; (2) the Orders conflict with the MLA, BLM's regulations, and BLM's internal guidance by imposing lease liability on an entity that never owned record title or operating rights in the Leases; (3) BLM has not established that Ovintiv—as an alleged corporate successor—is legally responsible for the Wells, and Ovintiv expressly disputes any obligation to plug, abandon, or reclaim them,

1

notwithstanding any prior sundry filings; (4) federal lessees do not retain "accrued" liability after a BLM-approved assignment; (5) Ovintiv lacked fair notice that it may face liability under the Leases; (6) BLM failed to seek relief from other entities that last held the relevant lease interests before attempting to impose obligations on a non-owner; (7) BLM failed to seek adequate bond coverage in violation of the regulations; and (8) even if BLM could hold Ovintiv responsible for the Wells, Ovintiv possesses no leasehold, contractual, or property rights authorizing access to the private surface estate and would risk trespass liability by attempting to enter the property and perform the demanded work.

For those reasons, Ovintiv respectfully requests that the Court rule the Orders and SDR Decision are arbitrary and capricious, contrary to law, and in excess of BLM's statutory and regulatory authority. Accordingly, the Court should vacate the Orders and SDR Decision.

## STATEMENT OF THE CASE

This case arises from a SDR Decision issued on July 17, 2025, changed and re-issued on August 15, 2025, upholding Notices of Incidents of Noncompliance Nos. 24AST0001I, 24AST0002I, 24AST0003I, and 24AST0004I (collectively, the "INCs") regarding the Burke Ranch #9-17, Burke Ranch #5, Burke Ranch #7, and Burke Ranch #9 wells (collectively, the "Wells"), located within the Burke Ranch Unit WYW-109445X on federal oil and gas leases WYW-100546, WYW-002118, WYW-002046, and WYC-081317B (collectively, the "Leases"). WY_AR_001259-1278. The INCs stem from Written Orders Nos. 23PG0013W, 23PG0021W, 23PG0026W, and 23PG0035W ("Written Orders") issued by BLM directing Ovintiv to plug and abandon the Wells and perform associated reclamation activities.

2

## I.   FACTUAL BACKGROUND

### A.   *History of the Leases*

As reflected in BLM's case files and Administrative Record ("AR"), BLM issued the Leases between 1950 and 1953, but there have been numerous changes in the Record Title Owners ("RTOs"), Operating Rights Owners ("OROs"), and Operators of the Leases over the past 70 years. *See* WY_AR_001194–001204, 1244–1258, 1270–1275. Pertinent here, BLM approved an assignment of record title from Exxon Corporation to McMurry Oil Company ("McMurry Oil") on May 4, 1988. WY_AR_000104–107, 1270–1275. On March 13, 2000, BLM approved an assignment of 100% of the record title in the Leases from McMurry Oil to Wyoming Oil & Gas, Minerals, Inc. ("WOGM"), effective February 1, 2000. WY_AR_000110–116, 1270–1274. WOGM subsequently transferred 100% operating rights to Manx Oil Company ("Manx"). *Id.* Thus, McMurry Oil owned no interest in the Leases and had no legal authority or ability to convey any interest in the Leases to its corporate successors through the mergers that took place *after* that time.

Through a series of subsequent BLM-approved assignments involving WOGM, Manx, Corkill Drilling Corporation ("Corkill"), and Hot Springs Resources, Ltd. ("Hot Springs")—which had nothing to do with McMurray Oil or any of its affiliates or successors—Terex ultimately acquired the record title and operating rights associated with the Leases and became operator of the Wells. WY_AR_ 000541–551, 1270–1274. The surface of the Leases is not owned by the United States and managed by BLM, but is owned in fee and was previously subject to surface access agreement that has since terminated under its own terms. WY_AR_000958–960 ("This agreement shall remain in effect for five years from May 1, 1993 and shall terminate by its own terms on May 1, 1998.").

3

As of 2019, Terex still owned record title and operating rights of the Leases. The Administrative Record contains no evidence that Terex assigned its lease interests or transferred the Applications for Permit to Drill ("APDs") to anyone, much less Ovintiv or its affiliates. According to the Written Orders, Terex had "been negligent in operating [the Leases]" and failed to plug and abandon the Wells, and BLM's bond did not cover the costs. WY_AR_000752–766. Thus, BLM turned to Ovintiv to bring the Lease into compliance.

### B. Corporate History of Ovintiv USA Inc.

Although Ovintiv never owned an interest in the Leases and does not appear in the chain of title, Ovintiv's corporate predecessor acquired a former RTO of the Leases, McMurry Oil. On May 1, 2000, AEC Oil and Gas (USA) Inc. ("AEC") acquired McMurry Oil from McMurry Energy Company ("MEC") through a stock purchase agreement (the "McMurry SPA"). WY_AR_000893–957. However, at the time of such acquisition, McMurry Oil had no interest in the Leases to transfer to AEC when the acquisition closed, as BLM approved McMurry Oil's assignment of 100% of the record title interests in the Leases to WOGM two months prior. WY_AR_000110–116. Further, the McMurry SPA explicitly stated that the sale of McMurry Oil to AEC excluded any assets or liabilities relating to the Leases and Wells, which were referenced in the McMurry SPA as "non-Jonah assets." WY_AR_000904–906; WY_AR_000951. Under the McMurry SPA, MEC, McMurry Oil's parent company, expressly retained liability for all obligations relating to "non-Jonah assets," including liability for these Leases. WY_AR_000951. Thus, AEC neither acquired an interest in the Leases nor assumed any liability associated with them. According to the AR, MEC ultimately became McMurry Energy Company, LLC, which became Shell Rocky Mountain Prod. LLC. WY_AR_000649.

In 2002, Alberta Energy Company, Ltd. ("Alberta Energy"), AEC's parent company, combined with PanCanadian Energy Corporation ("PanCanadian") in a merger of equals that

4

#112068292v12

resulted in the creation of EnCana Corporation, which eventually became Ovintiv Inc.[1] *See* WY_AR_000127–509.[2] Following that transaction, Alberta Energy and PanCanadian and their respective subsidiaries continued to exist as separate legal entities with separate assets and liabilities. *See* WY_AR_000158. Thus, the AR does not establish that any merger, acquisition, reorganization, or other corporate transaction transferred the Burke Ranch Leases, or any associated liabilities, to AEC, EnCana Oil & Gas (USA) Inc. ("EnCana"), or Ovintiv.

## II.  PROCEDURAL HISTORY

### A.  *BLM's Written Orders and INCs*

On approximately December 7, 2022, BLM issued Written Orders to Ovintiv concerning the Wells drilled by various operators within the Burke Ranch Unit WYW-109445X. *See* WY_AR_000752–766. Prior to the Orders, Ovintiv had never communicated with BLM regarding the Wells and had no knowledge of any alleged ownership interest in the Leases. In these Orders, BLM asserted—without meaningful factual or legal analysis—that Ovintiv was responsible for plugging and abandoning the Wells and reclaiming the surface disturbances under the Leases. *See id.* Although it is unclear from the AR, BLM included various corporate filings that Ovintiv (and its predecessor EnCana) submitted to the Wyoming Secretary of State or the Securities and Exchange Commission. *See e.g.*, WY_AR_000557–67; WY_AR_000970. For example, BLM included Ovintiv's annual report from 2023 in the AR. WY_AR_000970. These documents are irrelevant, and there is no evidence in the AR that BLM considered them in issuing the Orders or SDR Decision. Indeed, the SEC Annual Report post-dates the Orders.

---

[1] Ovintiv Inc. is not the party subject to the Written Orders or INCs. Ovintiv USA Inc. is the recipient of the Orders and the proper party to this case.

[2] It is unclear from the AR how and why BLM included document. It is not referenced, relied on, or cited in the SDR Decision or Orders.

5

BLM addressed the Orders to a "Past Record Title Owner/Operating Rights Holder," yet never explained how Ovintiv allegedly acquired either status. WY_AR_000752–766. Instead, BLM's Orders relied on a single, conclusory statement that unspecified "records" showed that Ovintiv assumed the assets and liabilities of unnamed past Record Title Owners and Operating Rights Owners. *See id.* Without identifying those records or naming these entities, BLM concluded that Ovintiv was therefore responsible under the Leases pursuant to 43 C.F.R. §§ 3106.7-2 and 3106.7-6. *Id.* BLM did not explain which regulation applied from which year and did not provide further factual support or articulate how or why these regulations imposed liability on Ovintiv.

In response to the Orders, Ovintiv filed a Request for State Director Review ("SDR"), docketed as SDR No. WY-2023-010, so that it could provide additional documentation to BLM. However, Ovintiv mistakenly requested an extension of time and missed the deadline for the SDR. *See* WY_AR_000768. After BLM dismissed the SDR, Ovintiv assumed (incorrectly) that it was required to provide a notice of intent to plug the Wells, based on BLM's statement that Ovintiv assumed obligations for the Wells and Leases. Thus, Ovintiv provided Sundry Notices and Notices of Intent to Plug the Wells on or about May 12, 2023, relying on BLM's statement that Ovintiv remained liable. *See* WY_AR_000812, 818, 824, 830, 835–886. Ovintiv submitted these Notices in error in an effort to avoid enforcement action or civil penalties. Regardless, Ovintiv properly challenged the INCs, and SDR Decision disputing that it possessed any liability for the Leases and Wells.

On September 14, 2023, based on numerous factors, Ovintiv requested an extension to submit a reclamation plan and to conduct any operations on the Leases related to the Wells. *See* WY_AR_000887–890. BLM did not respond or otherwise make any findings regarding Ovintiv's extension request. *See* WY_AR_0001276 ("[T]he matter was inadvertently overlooked, and no

6

formal response was issued."). On or about October 23, 2023, BLM issued INCs to Ovintiv as alleged prior RTO (which Ovintiv disputes), for failing to commence plugging operations as required by the BLM's Conditions of Approval. WY_AR_000807–830.

### B. *State Director Review of the INCs*

In response to the INCs, Ovintiv timely filed a request for SDR challenging these INCs on November 14, 2023. WY_AR_000794–806. In its SDR request, Ovintiv made substantially the same arguments it makes here, including but not limited to that fact that the Written Orders were contrary to the MLA, BLM regulations, and agency guidance and that BLM failed to establish that Ovintiv had any legal responsibility for the Wells from a corporate liability perspective. *Id.* Ovintiv further explained that McMurry Oil had assigned away all interests in the Leases before its later acquisition and merger transactions, meaning neither Ovintiv nor its predecessors ever acquired a lease interest that could support liability under the governing regulations. *Id.* The State Director granted Ovintiv's request for a stay, and on February 13, 2025, Ovintiv presented oral argument in support of its SDR. WY_AR_001222–1240.

On July 17, 2025, amended and re-issued on August 15, 2025, the Wyoming State Director issued SDR No. WY-2024-003. WY_AR_001259–1278. The SDR Decision agreed that Ovintiv was not a prior ORO, but nevertheless affirmed the INCs on the grounds that Ovintiv was a former RTO. *Id.* The State Director reasoned that Ovintiv was the "responsible party" for RTO McMurry Oil, based on a series of mergers—namely, "from McMurry Oil Company to McMurry Oil LLC, then to EnCana Oil & Gas (USA) Inc., and ultimately to Ovintiv USA Inc." *Id.* Based on this chain of mergers, the State Director concluded that BLM properly issued the Written Orders and INCs, because "Ovintiv is a [prior RTO] of the Leases" and therefore responsible for plugging and abandoning the Wells under 43 C.F.R. § 3106.72(b) (2024). WY_AR_001276. Notably, the State

7

Director never explained how Ovintiv qualified as a RTO without owning an interest in the Leases. Nor did the State Director identify any statute, regulation, guidance, IBLA decision, or any authority whatsoever authorizing BLM to hold a surviving entity liable as former RTO, where its corporate predecessor had assigned its lease interests to another entity prior to the merger. *Id*. On November 13, 2025, Ovintiv filed its Petition of Judicial Review of the Orders and SDR Decision. Doc. 1.

## LEGAL FRAMEWORK

### I.  STATUTORY LAW: THE MINERAL LEASING ACT

The MLA establishes a comprehensive statutory framework governing the issuance, transfer, and administration of onshore federal oil and gas leases. Relevant here, Congress expressly authorized the assignment of record title interests and the transfer of operating rights while specifying which parties remain responsible for lease obligations before and after approval of a transfer by the Secretary. *See* 30 U.S.C. § 187a. In pertinent part, the MLA provides:

> Notwithstanding anything to the contrary in section 187 of this title, any oil or gas lease issued under the authority of this chapter may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary and as to either a divided or undivided interest therein, to any person or persons qualified to own a lease under this chapter…*Until* such approval, however, the *assignor* or *sublessor* and his surety *shall* continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed. . . . 30 U.S.C. § 187a (emphasis added).

The MLA further provides:

> Upon approval of any assignment or sublease, the *assignee* or *sublessee shall* be bound by the terms of the lease to the same extent as if such assignee or sublessee were the original lessee, any conditions in the assignment or sublease to the contrary notwithstanding. Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands. . . . 30 U.S.C. § 187a (emphasis added).

#112068292v12

The MLA also grants the Secretary authority "to prescribe <u>necessary and proper rules</u> and regulations and to do any and all things necessary to <u>carry out and accomplish the purposes of this chapter</u>[.]" 30 U.S.C. § 189. That authority, however, must be exercised consistently with the liability framework set forth in Section 187a, as underscored by Congress's repeated use of mandatory language. *See* 30 U.S.C. § 187a ("Any partial assignment of any lease *shall*…release and discharge the assignor."), ("Until such approval, however, the assignor or sublessor and his surety *shall* continue to be responsible").

In this provision, Congress expressly identified the parties responsible for lease obligations, stating that the *assignor or sublessor <u>shall</u>* remain responsible pending approval of a transfer and that, upon approval, the *assignee or sublessee <u>shall</u>* become bound by the lease. *Id*. Congress's use of the word "shall" is indicative of a mandatory and non-discretionary requirement to impose lease liability on the named parties. *Jewell v. United States*, 749 F.3d 1295, 1298 (10th Cir. 2014) ("It is a basic canon of statutory construction that use of the word 'shall' indicates a mandatory intent."); *Wyoming v. United States DOI*, 2024 U.S. Dist. LEXIS 235015, *44 (10th Cir. 2024) ("[T]he word 'shall' usually connotes a requirement…[and] creates an obligation impervious to…discretion.") (internal citations omitted). The MLA statutory language, therefore, ties lease obligations to entities that actually acquire and hold lease interests. Congress also specified when an assignor's obligations terminate, as Section 187a provides that an approved assignment release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands. *Id.*

## II. REGULATORY LAW: 43 C.F.R. § 3106, *ET SEQ.*

Pursuant to the MLA, the Department of the Interior promulgated regulations governing the transfer of lease interests and the allocation of lease liability. *See* 43 C.F.R. § 3106, *et seq.*

9

Although BLM has amended those regulations over time, the regulatory language has consistently allocated responsibility by reference to lease ownership, assignment, and transfer of record title interests and operating rights. Across each version of the regulations, BLM has identified the parties responsible for lease obligations based on their status as record title owners, operating rights holders, assignors, assignees, transferors, or transferees of lease interests. The only significant change occurred in 2001, when BLM revised the regulations to address an assignor's continuing obligations following an approved transfer. *See* 66 Fed. Reg. 1883 (Jan. 10, 2001). Each version of the pertinent regulations are summarized below.

### A.  *The 1982 and 1988 Regulations: Consistent with the MLA*

Before 2001, BLM's regulations closely tracked the language of the MLA and imposed no continuing liability on former record title owners or operating rights owners who had divested themselves of their lease interests. Prior to 1988, the Department of Interior promulgated regulations that did not impose continuing liability on prior RTOs or OROs. *See* 43 C.F.R. § 3106.7-2 (1982); 47 Fed. Reg. 28563 (June 30, 1982). This regulatory language stated:

> *Until* the assignment is approved, the assignor and surety shall continue to be responsible for the performance of all obligations under the lease. If the assignment is not approved, their obligations to the United States shall continue as though no such assignment had been filed for approval. After approval, the *assignee* and surety shall be responsible for the performance of *all lease obligations* notwithstanding any terms in the assignment to the contrary. (emphasis added).

Although the regulatory text was revised in 1988, the governing principle remained unchanged. Importantly, this version was in effect when McMurry Oil owned its lease interests and, according to BLM, accrued plug, abandonment, and reclamation obligations—a theory untethered to the text of the 1988 regulations.[3] Specifically, 43 C.F.R. § 3106.7-2 (1988) provided:

---

[3] Ovintiv disputes BLM's accrued liability theories based on text to the MLA, and the fact that plugging liability does not accrue when a well is drilled, but when it is no longer capable of production in paying quantities, as discussed below in Section III.B.

> The *transferor* and its surety shall continue to be responsible for the performance of all obligations under the lease *until* a transfer of *record title* or of *operating rights* (sublease) is approved by the authorized officer. If a transfer of record title is not approved, the obligation of the transferor and its surety to the United States shall continue as though no such transfer had been filed for approval. After approval of the transfer of *record title*, the *transferee* and its surety shall be responsible for the performance of all lease obligations, notwithstanding any terms in the transfer to the contrary. When a transfer of *operating rights* (sublease) is approved, the *sublessee* is responsible for all obligations under the lease rights transferred to the sublessee. (emphasis added).

Consistent with the MLA, the 1982 and 1988 regulations tied responsibility to ownership of the lease interest. A transferor remained responsible until BLM approved the transfer, after which responsibility shifted to the transferee. The regulation contained no language preserving responsibility for obligations that accrued prior to approval of the transfer. The 1988 rulemaking record confirms this understanding, as BLM explicitly stated that "[i]n order to be *relieved* of obligations under a lease, a lessee must assign all of the record title interest in the lease." 52 Fed. Reg. 22602 (June 12, 1987). Thus, under the regulations in effect when McMurry Oil acquired and assigned its lease interests, and when AEC acquired McMurry Oil, lease obligations were predicated on ownership of the lease, and assignment of 100 percent of the record title interest relieved the assignor of further lease obligations.

### B. The 2001 Regulations: BLM Changes Decades of Regulatory Consistency

In 2001, BLM substantially revised Part 3100 to address drainage obligations and to change the "the responsibilities of assignors and assignees for reclamation and other lease obligations." 66 Fed. Reg. 1883 (Jan. 10, 2001). BLM attempted to explain that the prior regulations did not address an assignor's responsibility following approval of a transfer. *See id.* As part of those revisions, BLM added language—not included within the text of the MLA—stating that a transferor has continuing obligations after BLM approves the transfer of the lease. Specifically, 43 C.F.R. § 3106.7-2 (2001) stated:

11

**If I transfer my lease, what is my continuing obligation?**
(a) You are responsible for performing all obligations under the lease until the date BLM approves an *assignment* of your *record title interest* or *transfer* of your *operating rights*.

(b) After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer.

BLM also added 43 C.F.R. § 3106.7-6 (2001) in an attempt to clarify the obligations of a transferee. This provision stated:

**If I acquire a lease by an assignment or transfer, what obligations do I agree to assume?**
(a) If you acquire *record title* interest in a Federal lease, you agree to comply with the terms of the original lease during your lease tenure. You assume the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time. You must also maintain an adequate bond to ensure performance of these responsibilities.

(b) If you acquire *operating rights* in a Federal lease, you agree to comply with the terms of the original lease as it applies to the area or horizons in which you acquired rights. You must plug and abandon all unplugged wells, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time you receive the transfer. You must also maintain an adequate bond to ensure performance of these responsibilities.

While the 2001 revisions addressed continuing obligations following an approved transfer, the regulations continued to allocate responsibility based on ownership and transfer of lease interests. In response to critical comments, BLM reasoned that, "[w]hile [it] first look[s] to the current lessee for lease compliance," BLM wanted to preserve its rights "against all parties who had the potential to benefit from the well's existence." 66 Fed. Reg. 1890. Like the 1988 version, these regulations imposed obligations on assignors, assignees, transferors, transferees, record title

12

owners, and operating rights holders, but contained no language addressing corporate successor liability.

### C. The 2024 Regulations: In Effect Today, But Not Applicable

BLM revised Part 3100 a final time in 2024. Although the changes to Section 3106, *et seq*. were minimal, the regulations were re-numbered. *See* 89 Fed. Reg. 30942 (Apr. 23, 2024). BLM merely reorganized and clarified the obligations imposed under the 2001 regulations. *Id.* The updated regulatory language in 43 C.F.R. § 3106.76 (2024) states:

> **Obligations of assignee or transferee**
> (a) The *assignee* of *record title* agrees to comply with the terms of the original lease during the lease tenure. The assignee assumes the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known existed at the time of the transfer. When required, the record title holder must also maintain an adequate bond to ensure performance of these responsibilities.
>
> (b) The *transferee* of *operating rights* agrees to comply with the terms of the original lease as it applies to the area or horizons for the interest acquired. The transferee assumes the responsibility to plug and abandon all wells that are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known existed at the time of the transfer. When required, the operating rights holder must also maintain an adequate bond to ensure performance of these responsibilities.

Additionally, the updated language in 43 C.F.R. § 3106.76 (2024) stated:

> **Continuing obligation of an assignor or transferor**
> (a) The *lessee* or *sublessee* remains responsible for performing all obligations under the lease until the date the BLM approves an assignment of record title interest or transfer of operating rights.
>
> (b) After the BLM approves the assignment or transfer, the *assignor* or *transferor* will continue to be responsible for lease obligations that accrued before the approval date, whether or not such obligations were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer.

13

In sum, since the enactment of 30 U.S.C. § 187a in 1946, until 2001, BLM did not enforce lease and well obligations against former RTO and ORO. BLM changed course in 2001 and attempted to expand that liability without congressional approval in 2001 and 2024 regulations. Importantly, none of these contains a provision imposing lease liability based solely on a merger, acquisition, corporate reorganization, or successor-corporation status.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA") the Court will hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations … ." 5 U.S.C. § 706(2). The APA also directs that "reviewing court[s] shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. It follows that "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024). Further, the Court shall not defer to agencies' interpretations of their own regulations unless, "after exhausting the traditional tools of construction," the regulation remains "genuinely ambiguous," and the court independently determines that the interpretation merits "controlling weight." *Kisor v. Wilkie*, 588 U.S. 558, 575–576 (2019). In making that determination, the court must assess whether the interpretation reflects the agency's authoritative and official position, implicates its substantive expertise, and is not merely a new or convenient litigation position. *Id.*

"Judicial review of agency action is governed by the standards set forth in § 706 of the APA, requiring the reviewing court to engage in a 'substantial inquiry.'" *State v. United States DOI*, 493 F. Supp. 3d 1046, 1060 (D. Wyo. 2020) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S.

14

#112068292v12

402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)). It is a fundamental principle of administrative law that agency action must be based on "reasoned decisionmaking," which requires the agency to articulate a rational connection between the facts found and the conclusions reached. *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998); *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA also requires courts to set aside agency action found to be "in excess of [an agency's] statutory jurisdiction, authority, or limitations" or contrary to an agency's own policies and regulations. 5 U.S.C. § 706(2)(C); *Kansas ex rel. Kobach v. United States DOI*, 72 F.4th 1107, 1133 (10th Cir. 2023).

15

#112068292v12

## ARGUMENT

**I.** **NEITHER THE MLA NOR BLM'S REGULATIONS SUBSTANTIATE OVINTIV'S LIABILITY AS A NON-LESSEE** The Court should set aside the SDR Decision, INCs, and Written Orders under 5 U.S.C. § 706 because BLM's liability determination lacks any support in the text of the MLA, BLM's regulations, or the AR. "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure." *Kansas*, 72 F.4th at 1133. It follows that an agency acts arbitrarily and capriciously when it disregards its own regulations, and courts owe no deference to an agency interpretation that conflicts with the clear regulatory text. *Id.*; *Kisor*, 588 U.S. at 574–89. Even if an agency's interpretation is found to comply with its regulations, an agency cannot exceed the scope of authority conferred by its governing statute, which the reviewing court must independently construe. *See Loper Bright*, 603 U.S. at 393.

Here, BLM appeared to rely on the 2001 versions[4] of 43 C.F.R. §§ 3106.7-2 and 3106.7-6 in issuing the Written Orders. *See* WY_AR_000752–766. Specifically, BLM stated that "records show Ovintiv USA Inc. assumed the assets and liabilities of Past Record title Owners and Operating Rights Holders" and therefore Ovintiv was ordered to plug and abandon the Wells in accordance with those provisions. *Id.* In the SDR Decision, however, the State Director erroneously relied on the 2024 version of Section 3106.72 to uphold the Written Orders and INCs. WY_AR_001276. After finding that Ovintiv was not an ORO, the State Director still found that "Ovintiv is the responsible party for [prior RTO], McMurry Oil Company…due to a series of mergers." *Id.* In turn, the State Director concluded that Ovintiv *itself* was a prior RTO subject to

---

[4] Ovintiv assumes BLM relied on the regulations amended in 2001, because the 2001 revisions added Section 3106.7-6. However, Ovintiv does not agree that these regulations should apply, given that the relevant conduct occurred in 2000.

plug, abandonment, and reclamation duties under § 3106.72. *Id.* There is simply no basis in the MLA or BLM's regulations to support this conclusion.

As a threshold matter, Ovintiv maintains that neither the 2001 nor 2024 regulations govern because both postdate the events on which BLM's liability theory rests—namely McMurry Oil's ownership of record title and the alleged "accrual" of plugging and abandonment liabilities during its lease tenure. *See infra* Section III, IV. However, even assuming the 2001 or 2024 regulatory scheme applies, neither supports BLM's liability theory. In every relevant respect, the MLA and BLM's implementing regulations tie lease liability to ownership, transfer, retention, or assignment of a recognized lease interest.

### A.  *Ovintiv Never Acquired Record Title or Any Other Interest in the Leases*

BLM's liability determination appears to rest on the premise that Ovintiv is itself a prior RTO through a series of mergers and acquisitions dating back to 2000. *See* WY_AR_001276. But contrary to State Director's findings, Ovintiv was never a RTO as defined under BLM's clear and unambiguous regulations. Even more, the State Director never explains *how* Ovintiv attained RTO status under the governing regulations. *See id.* Instead, the State Director makes an unexplained leap from asserting that Ovintiv is merely the "responsible party" for a former RTO (which Ovintiv disputes)[5] to concluding that Ovintiv *itself* is a prior RTO. *See id.*; *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) ("The agency must make plain its course of inquiry, its analysis and its reasoning."). BLM did not—and cannot—bridge that gap in reasoning. Ovintiv never acquired an interest in the Leases, and nothing in the regulations suggests that RTO status turns on corporate lineage rather than ownership of the lease.

---

[5] *See infra*, Section II. Ovintiv disputes that it is the "responsible party" for RTO, McMurry. Ovintiv's corporate predecessors did not assume McMurry Oil's Lease obligations in the McMurry SPA.

17

Under 43 C.F.R. § 3100.0-5(c),[6] record title is "a lessee's interest in a lease which includes the obligation to pay rent, and the rights to assign and relinquish the lease." *Id.* Where BLM did not originally issue the lease to a party, a party can only acquire record title through a BLM-approved transfer (i.e., "assignment"). § 3100.0-5(e) (defining "transfer" and "assignment"); § 3106.1(b) ("The rights of the transferee to a lease or an interest therein shall not be recognized by the Department until the transfer has been approved by the authorized officer."). Ovintiv plainly fails the criteria for record title owner under Section 3100.0-5—Ovintiv never had an obligation to pay rent, never held a lease interest that it could assign or relinquish, and never acquired record title through a BLM-approved assignment. *Id.*

The corporate merger exception in Section 3106.8-3 does not alter the outcome.[7] The regulation simply eliminates the need for a formal BLM-approved assignment when a merger transfers an existing lease interest to a surviving entity by operation of law. 43 C.F.R. § 3106.8-3. By its plain terms, the regulation presupposes that the dissolving corporation holds a lease interest capable of transferring through the merger. *Id.* ("Where a corporate merger affects leases situated in a State where the transfer of property of the dissolving corporation to the surviving corporation is accomplished by operation of law, no transfer of any affected lease interest is required."). BLM's own practice in documenting and analyzing mergers confirms this understanding. *See e.g.*, WY_AR_000122 (BLM's merger recognition) ("We have not yet abstracted the lease files to

---

[6] Ovintiv refers the numbering and language of the regulations in effect at the time of McMurry Oil's ownership and assignment to WOGM in 2000. The relevant definitions under § 3100.0-5 remained largely unchanged from the 1988 version to the 2024 version.

[7] Even if Section 3106.8-3 (or the current version, § 3106.83) supported BLM's position (which it does not), BLM never cited or relied on that regulation in the Written Orders, INCs, or SDR Decision. Any attempt to invoke the regulation now would constitute an impermissible "post hoc rationalization" or convenient litigation position. *Olenhouse*, 42 F.3d at 1577–78; *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1271, n.21 (10th Cir. 2020). Ovintiv addresses the regulation only for completeness and to demonstrate that nothing in *any* of BLM's regulations supports the result reached in the SDR Decision.

determine if the entities affected by this merger *hold an interest* in the leases identified….If you identify additional leases in which the merging entities *maintain an interest*, please contact this office."). Here, no entities affected by any merger held interests in the Leases at the time of the transaction; BLM approved McMurry Oil 's assignment to WOGM two months prior to AEC's acquisition of McMurry Oil. WY_AR_000110–116; *infra* Section II.

In sum, neither the AR nor BLM's regulations support the conclusion that Ovintiv was a RTO. To the contrary, both the record and the plain language of the regulations foreclose that result. Accordingly, BLM's determination that Ovintiv was or is a RTO lacks any basis in law and is arbitrary and capricious.

### B. Neither the MLA Nor BLM's Regulations Extend Lease Liability Based on Corporate Lineage

Because Ovintiv never held record title, operating rights, or any other interest in the Leases, Ovintiv assumes BLM's liability theory relies on Ovintiv's corporate lineage rather than ownership of the Leases. However, neither the plain meaning or text of the MLA nor BLM's regulations support this theory, and BLM never explains or documents this theory in the Orders or SDR Decision.

The MLA authorizes assignment of federal leases and provides that "[u]ntil such approval, however, the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed." 30 U.S.C. § 187a. Importantly, Congress directed that BLM look to the "assignor" or "sublessor" for lease liability—not any successor, parent, affiliate, corporate successor, entity that acquires the assignor via merger. *See id.* BLM's attempt to impose liability on non-lessees cannot be reconciled

19

with the plain language of the statute and is not entitled judicial deference. *Loper Bright*, 603 U.S. at 393.

BLM's regulations compel the same result. Regardless of which version of the regulations the Court considers, no language extends abandonment and reclamation liability to a corporate affiliate of an entity alleged to have owned an interest in or operating a federal lease. Consistent with the MLA, the language of the regulations make clear that lease liability hinges on the acquisition, ownership, transfer, or retention of a lease interest. Indeed, the 2001 and 2024 regulations cited in BLM's Orders and SDR Decision speak only of lessees, sublessees, assignors, and transferors. *See* 43 C.F.R. §§ 3106.7-2 (2001); 3106.7-6 (2001); 3106.72 (2024). By definition, each categorically refers to a person or entity that held a lease interest at some point in time. *Id.*

Moreover, BLM's corporate-merger regulation does not support Ovintiv's liability. As explained above, 43 C.F.R. § 3106.8-3 applies only where a merger affects an existing lease interest held by one of the merging entities—a circumstance that is not present here. *See infra* Section I.A. Notably, when addressing corporate mergers, BLM chose to adopt a regulation that is narrow in its language and purpose. By its terms, Section 3106.8-3 addresses only whether a formal BLM-approved transfer is required when a lease interest passes by operation of law through a merger. It does not address lease liability at all—much less provide that liability attaches through corporate affiliation with a prior lessee. BLM "could easily have drafted language to achieve the result which it now advocates," yet it chose not to. *Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1261 (10th Cir. 2004). Thus, the Court cannot "torture the language [of the regulation] to reach the result the agency wishes." *Id.*

20

### C.  BLM Precedent and Guidance Does Not Support Lease Liability Based on Corporate Lineage

If the text of the MLA and BLM's regulations were not clear enough, BLM's own guidance and precedent confirm that lease liability follows lease ownership, not corporate lineage.

BLM has issued informal guidance in the form of Instruction Memorandum ("IM") regarding the liability of former lessees and ORO for the plugging and abonnement of certain wells. *See* IM 2021-039, Orphaned Well Identification, Prioritization, and Plugging and Reclamation (July 15, 2021) (Exhibit A).[8] BLM's own internal instruction memorandum states that BLM will attempt to enforce plugging liability on prior RTO and prior ORO, not their corporate subsidiaries, successors, and entities that may have acquired or merged with prior RTO and ORO. *Id.* Indeed, BLM's current guidance on orphan wells states that "Legally liable parties for surface disturbance for a well that is located on a Federal or Indian oil and gas lease include the current operator, the current Record Title Owner(s) of the lease (RTO), the current Operating Rights Holder(s) (ORH), and all previous RTOs and ORHs that *held an interest* in the lease since the surface disturbance occurred or the well was drilled." *Id*. Nothing in the IM states that a corporate parent, affiliate, or entity that acquires a company with potential federal oil and gas lease liabilities thereby becomes liable for those obligations.

Likewise, when BLM proposed the amendments that became Section 3106.7-2, it explained that the purpose of the regulation was to "reserve [its] rights against all parties who had the potential to benefit from the well's existence. 66 Fed. Reg. 1889–90 (Jan. 10, 2001). That rationale aligns with liability based on ownership of lease interests and operations conducted on

---

[8] Although Interior rescinded IM 2021-039 on January 27, 2025, this IM was in effect at the time of the Orders and INCs and remains relevant in interpreting the regulations in effect at this time.

21

the lease. It does not support extending liability to entities that never owned an interest in the lease and never had the opportunity to benefit from record title or operating rights.

The IBLA's order in *Apache Corp.*, reinforces the same principle. IBLA 2017-65 (Dec. 6, 2021) (Exhibit B). There, the Interior Board of Land Appeals squarely addressed whether BLM may impose plug, abandonment, and reclamation obligations on a corporate entity based on private corporate transactions rather than BLM-approved lease ownership. *Id.* at 7–8. Based on approved BLM assignments, APC Operating Partnership LP ("APC") owned 50% record title in the relevant lease and assigned that interest to Apache Corporation. *Id.* APC later dissolved, and Apache—which owned 75% of APC at that time—argued that APC privately transferred its lease interests to Apache, but that BLM had never approved any assignment from APC to Apache. *Id.* BLM's records continued to identify APC as the record title owner. *Id.* at 11. When disputes arose concerning plugging and abandonment obligations for wells on the lease, the Acting Deputy State Director nevertheless gave effect to the unapproved transactions and found that Apache was responsible. *Id.*

The IBLA rejected that approach, emphasizing that BLM could not rely on private assignments rather than its own records to establish liability and reiterating that "[t]he case record maintained by BLM is the Government's only source of information about a lease and determines the identity of lessees responsible to the Secretary for compliance with terms of the lease." *Id.* at 9. Thus, BLM cannot rely on private transactions rather than its own records (executed assignments of record title) to establish liability for plugging and abandoning wells. *Id.* at 11.

Equally important, the IBLA never suggested that Apache could be held liable simply because of its corporate relationship to APC or other predecessor entities. *See id.* at 5 and fn 28. Instead, the entire analysis centered on whether Apache had actually acquired a lease interest

22

through a valid, BLM-recognized transfer. *See id.* at 9–11. Had corporate affiliation itself been sufficient to impose liability, there would have been no need for the extensive analysis concerning approved assignments and recognized lease ownership. *See id.* at 5 (reasoning that the file showed APC acquired RTO, but there was no BLM approved assignment to Apache, a 75% owner and corporate affiliate); *id.* (noting the Acting State Director ordered Apache to plug and abandon the U.S. Cochise Wells based on its drilling and use of these wells, not as APC's corporate affiliate). Indeed, if BLM's regulations did not recognize corporate separateness between these affiliated entities, then the assignments between Apache, APC, and AEC become meaningless.

In short, both BLM's guidance and IBLA precedent point in the same direction: liability follows recognized lease interests reflected in BLM's records, not corporate lineage. Because Ovintiv never acquired a recognized interest in the Leases, BLM's regulations, precedent, guidance, and the AR do not support treating Ovintiv as liable for McMurry Oil's lease obligations.

## II. GENERAL PRINCIPLES OF CORPORATE SUCCESSOR LIABILITY DO NOT SUPPORT OVINTIV'S LIABILITY.

As set forth above, liability under a federal lease is a matter of regulatory law and distinct from general corporate liability principles. *See infra*, Section I.B. Indeed, BLM has long distinguished between corporate transactions that have effects under state law and those that alter rights and obligations under the federal leasing scheme. *See, e.g., Apache Corp.*, IBLA 2017-65 (Dec. 6, 2021); *Beren Corporation*, IBLA 2021-205 (Dec 17, 2021); *River Gas Corp. v. Pullman*, 960 F. Supp. 264, 265–66 (D. Utah 1997). However, even if the Court concludes that corporate successor law applies under the regulations (which Ovintiv disputes), those principles do not support BLM's theory of Ovintiv's liability under the Leases. Accordingly, BLM's Written Orders, INCs, and SDR Decision cannot be sustained under either the governing federal leasing framework or traditional principles of corporate law.

23

### A. *General Principles of Corporate Liability*

Under general corporate law, entities are not automatically liable for their predecessors, successors, or affiliates. In contrast, "[c]reation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace." *SSP Partners v. Gladstrong Invs. Corp.,* 275 S.W.3d 444, 455 (Tex. 2008); *see also Frank v. U.S. West, Inc*., 3 F.3d 1357, 1362 (10th Cir. 1993). Accordingly, "a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons…The corporate veil may not be pierced absent a showing of improper conduct." *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993).

There is no dispute that it is "a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation…is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, (1998) (internal quotations omitted). Courts acknowledge that "corporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir. 1990). General corporate law holds that "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary." *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1363 (10th Cir. 1974).

Mere financial interest, ownership, and control are not sufficient to hold a parent liable for the subsidiary. *Luckett v. Bethlehem Steel Corp*., 618 F.2d 1373, 1379 (10th Cir. 1980). "[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among

24

separate entities." *Cyprus Amax Minerals Co. v. TCI Pac. Communs., LLC*, 28 F.4th 996, 1007 (10th Cir. 2022). Thus, a court will disregard the corporate entity where fraud or illegal or inequitable conduct is the result of the use of the corporate structures. *Luckett*, 618 F.2d at 1379.

Federal common law permits courts to treat multiple entities as the same entity if they are alter egos, under a two-part test: "(i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and [its owners] are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993). This court listed several factors relevant to the first prong of this analysis: "(1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate corporate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses." *Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.*, 176 F. Supp. 2d 1091, 1097 (D. Colo. 2001); *Baxter v. Grand Lodge of the Indep. Ord. of Odd Fellows of Colo.*, No. 24-cv-00984-GPG-MDB, 2025 U.S. Dist. LEXIS 106482, at *11–12 (D. Colo. 2025).

### B. Ovintiv Did Not Assume Liability Under the Leases When AEC Acquired McMurry Oil

BLM's SDR Decision, Written Orders, and INCs contain no explanation or authority for the presumption that Ovintiv assumed the liability for the Leases when AEC acquired McMurry Oil from MEC. BLM attempts to impute liability to Ovintiv through its corporate succession that

25

#112068292v12

went from EnCana, which was a merger of Alberta Energy and PanCanadian Energy Corporation. *See* WY_AR_000127–509. Ovintiv was created subsequently through a name change after the merger of EnCana and Newfield Exploration Company.

Ovintiv does not dispute that AEC acquired McMurry Oil from MEC on May 1, 2000 via the McMurry SPA. WY_AR_000893–957. However, as a matter of law, AEC's acquisition of McMurry Oil established that AEC would not acquire any liability for any leases not expressly included as part of the transactions. *See* WY_AR_000906, 000951. Under the McMurry SPA, AEC and McMurry Oil agreed that AEC would only acquire McMurry Oil for its "Jonah Field." WY_AR_000904–906. As part of this acquisition, MEC expressly retained all liability related to any oil and gas lease not expressly owned by McMurry Oil at the time of the acquisition, including the "non-Jonah assets" which would have included any alleged "accrued" liability related to the Leases. WY_AR_000951 (Sections 14.2 and 14.3(a)).

26

As the AR reflects, prior to AEC's acquisition of McMurry Oil, BLM expressly approved the assignment of the Leases from McMurry Oil to WOGM on March 13, 2000, nearly two months prior to AEC's acquisition of McMurry Oil. WY_AR_000110–116. These assignments were intentional—indeed required—prior to AEC's acquisition of McMurry Oil. WY_AR_000906 (convent of the McMurry SPA that all non-Jonah leases must be transferred out of McMurry Oil). Therefore, McMurry Oil did not own the Leases when AEC acquired it. *Id.*



Specifically, under Section 1.4 of the SPA, McMurry Oil was required to transfer the "Non-Jonah Assets" to another entity. *Id*. This provision states:

27

> The Oil and Gas Assets and Other Assets are sometimes referred to herein as the "Assets."
>
> 1.4    Non-Jonah Assets.  The parties acknowledge that as of the date of execution of this Agreement, the Company owns assets other than those described in Sections 1.2 and 1.3 above (the "Non-Jonah Assets").  It is further acknowledged and agreed that on or before five (5) days prior to Closing the Non-Jonah Assets will be transferred out of the Company to Seller and Buyer consents to the transfer by the Company to Seller of the Non-Jonah Assets.  As the transfers of the Non-Jonah Assets to Seller are made, Seller shall provide Buyer with a description of the transferred asset(s) (which notice may be satisfied by providing Buyer with a copy of the transfer document) and, on or before ten (10) days prior to Closing, Seller shall provide to Buyer a complete list of the Non-Jonah Assets.

WY_AR_000906. Indeed, as part of the transaction, AEC and McMurry Oil expressly listed all of the leases that would be part of the transaction and the Leases at issue here were not part of the transactions in Schedule 1.2(b). Schedule 1.2(b) to the McMurry SPA (Exhibit C).[9] Thus, the parties expressly agreed that AEC would not acquire the Leases and Wells and would not acquire any liability for these assets. *See id.* Thus, as a matter of law, AEC never owned an interest in the Leases, was not a RTO, and was not an ORO of any of the Leases.

Two years later, Alberta Energy (the parent company of AEC) merged with PanCanadian Energy Corporation in 2002 as a "merger of equals" and was renamed EnCana Corporation.

The following is an abbreviated corporate organizational structure of AEC and PanCanadian before the completion of the Merger.



---

[9] BLM did not include all of the schedules of the McMurry SPA in the AR. This schedule is part of the SPA and should have been included.

#112068292v12

WY_AR_000127—509. Prior to this merger, Alberta Energy and AEC were both separate entities with separate liabilities and obligations. WY_AR_000158; *Bestfoods*, 524 U.S. at 61.

Through the 2002 merger, PanCanadian acquired, directly and indirectly, all of the Alberta Energy's Shares in exchange for PanCanadian Shares, and PanCanadian's name changed to EnCana Corporation. In other words, PanCanadian was the surviving entity, and Alberta Energy merged into PanCanadian. WY_AR_000146. The Alberta Energy Shares transferred to PanCanadian were subsequently transferred by PanCanadian to ArrangeCo. As a result, on completion of the merger, the Alberta Energy shareholders and PanCanadian shareholders held PanCanadian shares (EnCana Corporation shares after the name change), and ArrangeCo. held all the Alberta Energy Shares. Alberta Energy and PanCanadian remained separate entities, had separate subsidiaries, and retained separate assets and liabilities. *See* WY_AR_000158.

The following is an abbreviated corporate organizational structure of EnCana after the completion of the Merger.



(1) All of the AEC Shares will be owned by ArrangeCo, a wholly-owned subsidiary of EnCana.

WY_AR_000158.

29

These separate legal entities had separate liabilities, and the law does not impute liability to these separate entities because of their corporate relationship. *Bestfoods*, 524 U.S. at 61; *Greater Kan. City Roofing*, 2 F.3d at 1051. There is no document in the AR that EnCana or Ovintiv USA Inc. assumed the liability for Leases that none of these affiliates or subsidiaries ever owned an interest. More importantly, the AR does not substantiate—and BLM has not explained—this theory of liability in the Orders and SDR Decision.

Here, Ovintiv did not acquire any entity and did not assume the liability of a separate entity that owned any interest in the Leases at the time Ovintiv acquired it. AEC, EnCana, Ovintiv, and their separate and distinct subsidiaries are separate legal entities, and each has a separate corporate existence and is treated separately from each of the subsidiaries for purposes of liability. *Quarles*, 504 F.2d at 1362. More importantly, Ovintiv is not legally responsible and not liable for the acts of its subsidiaries and former subsidiaries. *Bestfoods*, 524 U.S. at 61 ("a parent corporation . . . is not liable for the acts of its subsidiaries."). Thus, Ovintiv acquired neither any interest in the Leases, nor acquired a company that owned any interests in the Leases at the time of the acquisition. BLM cites no authority—and Ovintiv has found none—that the terms of the Leases, the MLA, or BLM regulations, or any other authority impose liability on Ovintiv in such a situation. Nor has BLM ever maintained or claimed that Ovintiv, as the parent of AEC, acted in such a manner that its corporate veil must be pierced. *Greater Kansas City Roofing*, 2 F.3d at 1052. Indeed, existing "law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Cascade Energy & Metals Corp.*, 896 F.2d at 1576.

In sum, the SDR Decision, Written Orders, and INCs, BLM has not articulated, much less substantiated, any basis for Ovintiv to be responsible for an alleged subsidiary, AEC, that never

30

acquired any interest in the Leases or Wells. Thus, all of BLM's orders are arbitrary, capricious, and contrary to law.

### C. Chain of Title Follows the Leases to Terex, Not the Entity

Indeed, the chain of title shows that the Leases transferred from McMurry Oil to WOGM to Manx to Corkill to Hot Springs, and finally, to Terex. WY_AR_001244—001258. Based on BLM's records, through various other BLM approved assignments, involving WOGM, Manx, Corkill, Hot Springs, Terex obtained all of the record title, operating rights and was the operator of the Wells with surface access through its private agreement with the surface owner. The following diagram displays these assignments, all approved by BLM.



31

Thus, the liability flowed from Exxon, to McMurry Oil, to WOGM, all the way down to Terex. EnCana and Ovintiv appear nowhere in this chain of title for the Leases. Under the MLA and BLM's regulatory scheme, liability for the Leases and Wells flowed through the Leases—not corporate mergers—and BLM should follow this path to hold these entities liable.

### III. OVINTIV DID NOT ACCRUE CONTINUING PLUGGING, ABANDONMENT, OR RECLAMATION OBLIGATIONS UNDER THE MLA AND BLM REGULATIONS

Given BLM's failure to justify or explain its liability theory, Ovintiv assumes BLM's determination also rests on the premise that McMurry Oil incurred plugging, abandonment, and reclamation obligations before assigning its lease interests, and that those obligations survived McMurry Oil 's assignment. However, that theory is inconsistent with the MLA and BLM's regulations in effect during McMurry Oil 's lease tenure.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517, 108 S. Ct. 805, 98 L. Ed. 2d 898 (1988)). Accordingly, an "essential function" of a court's review under the APA is to determine "whether an agency acted within the scope of its authority." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015).

Under the MLA, the Secretary may "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the MLA]." 30 U.S.C. § 189. However, BLM may not exercise its regulatory authority "in a

32

manner that is inconsistent with administrative structure that Congress enacted into law." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125; *State v. United States DOI*, 493 F. Supp. 3d 1046, 1064 (D. Wyo. 2020) (invalidating a BLM regulation that exceeded scope of authority under the MLA, even before *Loper Bright* overturned *Chevron* deference).

### A. *BLM's Regulations Exceed Its Authority Under the MLA, and Lessees Do Not Retain "Accrued" Liability After A BLM-Approved Assignment*

As explained above, the MLA provides that "the assignor . . . and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment . . . had been executed" *until* the Secretary approves the assignment, but that "the assignee . . . shall be bound by the terms of the lease to the same extent as if such assignee . . . were the original lessee, notwithstanding any contrary terms in the assignment." 30 U.S.C. § 187a. There is no provision in the MLA regarding the retention of any liabilities by the assignor that have "accrued" at the time of the assignment. *Id.* Accordingly, Congress made clear that once Secretary approves of the assignment to the assignee, the MLA imposes exclusive responsibility on the assignee for all obligations—whether accrued before or after approval of the assignment. *Id.* If the MLA was ambiguous on this issue—which it is not—courts, not agencies, must determine statutory meaning. *Loper Bright,* 603 U.S. at 412. The unambiguous language of the MLA is definitive that an assignor does not remain secondarily liable for plugging and abandonment operations that "accrued" once the Secretary approves an assignment of all interests in a lease. Thus, under the plain and unambiguous language of the MLA, Ovintiv is not liable for any well obligations once BLM approved the assignment of the Leases from McMurry Oil to WOGM, and then to Manx, to Corkill to Hot Springs and then to Terex. WY_AR_000108–116.

In 2000, at the time that AEC acquired the stock of McMurry Oil, the regulations in effect were consistent with the MLA in that the assignor remained responsible for all lease obligations

until BLM approved the transfer, after which the assignee became responsible for such obligations.

43 C.F.R. § 3106.7-2 (1988), 53 Fed. Reg. 17340, 17356 (May 16, 1988). It stated:

> The transferor and its surety shall continue to be reasonable for the performance of all obligations under the lease until a transfer of record title or of operating rights (sublease) is approved by the authorized officer. If a transfer of record title is not approved, the obligation of the transferor and its surety to the United States shall continue as though no such transfer had been field for approval. After approval of the transfer of record title, the transferee and its surety shall be responsible for the performance of all lease obligations, notwithstanding any terms in the transfer to the contrary.

*Id.* (emphasis added). Only if BLM denied the assignment, would the assignor (here McMurry Oil) remained liable. *Id.*

In 2001, BLM amended this regulation to add in the language that an transferor remained liable for obligations that had "accrued" prior to BLM's approval of assignment of the lease. In contrast to the 1988 version, the new version of Section 3106.7-2(b) in the 2001 Rule departed from the MLA in its expansion of the obligations imposed on an assignor. It provided:

> After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer.

43 C.F.R. § 3106.7-2(b) (2001); 66 Fed. Reg. 1883, 1892 (Jan. 10, 2001). The MLA had not changed and BLM gave no substantive explanation for expanding the regulation beyond Congressional intent. 63 Fed. Reg. 1938 (Jan. 13. 1998) (Proposed Rule) and 66 Fed. Reg. 1989–90 (Jan. 10, 2001) (Final Rule). BLM's expansion of this requirement beyond Congressional intent and the unambiguous language of the MLA (Section 187a) is unlawful. *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125.

34

When BLM expanded the scope of this regulation beyond Congress's intent, BLM's only explanation is that it is "prudent to reserve our rights against all parties who had the potential to benefit from the well's existence." 66 Fed. Reg. 1890 (Jan. 10, 2001). Recognizing that BLM is attempting to ensure that orphan wells are properly plugged, that apparent justification for changing this regulations does not give BLM unfettered authority to promulgate and expand Section 3106.7-2(b) beyond what the MLA allows. *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125 ("Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"); *see also Wyoming v. United States DOI*, 136 F. Supp. 3d 1317, 1329 (D. Wyo. 2015) (BLM's attempt to regulate hydraulic fracturing also found invalid for exceeding the scope of the MLA).

In the 2001 Rule, BLM unlawfully expanded the MLA to include the obligation of former lessees to plug and abandon wells and that this obligation "accrues" once the wells are drilled and become producing. This new determination is likewise beyond the scope of the MLA. When Congress passed the MLA, it made clear that in partial assignments, the assignor would be liable for those obligations that had "accrued." 30 U.S.C. § 187a. Specifically, Congress directed that once the Secretary approved a partial assignment of a lease, the assignor/transferer is released from "obligations thereafter accruing." 30 U.S.C. § 187a. The MLA contains no similar provision regarding the legal obligation to plug and abandon a well after you transfer all interest in the same well and lease. Likewise, BLM's implementation and additional legal requirements—by introducing the concept of when a lease obligation "accrues"—creates substantive legal obligations that arise *after* BLM approves an assignment. In doing so, BLM has unlawfully

35

expanded assignor liability beyond Congress's directive and improperly narrowed the statutory release in Section 187a. *WildEarth Guardians*, 784 F.3d at 683.

### B. Lease Liability Does Not "Accrue" When a Well is Drilled

Although not explained, documented, or justified in BLM's SDR Decision, Written Orders, or INCs, BLM's apparent position is that the Ovintiv's liability to plug and abandon the Wells "accrued" when the Wells were drilled, prior to McMurry Oil 's assignment of the Leases. However, neither the MLA nor BLM's regulations define or explain when plugging and abandonment obligations "accrue." *See* 30 U.S.C. § 187a; 43 C.F.R. § 3100, *et seq.* The statute is unambiguous on this point and BLM is entitled to no deference in its interpretation and expansion of it. *Loper Bright*, 603 U.S. at 393.

Under the ordinary meaning of the word "accrue," the obligation must be mature, due, and enforceable. *See* Black's Law Dictionary (12th ed. 2024). Plug and abandonment obligations do not become fixed or enforceable until the well is no longer capable of production and abandonment is required. *See* 43 C.F.R. § 3162.3-4 (plugging and abandonment obligations only begin when well is no longer capable of producing in paying quantities). By treating future plugging obligations as having "accrued" upon drilling, BLM expands assignor liability beyond the limits imposed by the MLA. *See Kansas ex rel. Kobach,* 72 F.4th at 1133. Further, because BLM has neither defined nor explained its interpretation of "accrued" liability, that interpretation is entitled to no deference and cannot support BLM's liability determination. *Kisor*, 588 U.S. at 579 ("an agency's reading of a rule must reflect 'fair and considered judgment'" to receive deference).

### IV. OVINTIV LACKED FAIR NOTICE THAT IT COULD FACE LIABILITY UNDER THE LEASES

The SDR Decision, INCs, and Written Orders must also be set aside, because BLM's liability theory deprives Ovintiv of fair notice under the Due Process Clause. Under the United

36

#112068292v12

States Constitution and fundamental principles of administrative law, an agency must provide the regulated community "fair notice" of the standards. *See General Electric Co. v. U.S.E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). Fair notice exists only when "a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Walker Stone Co. v. Secretary of Labor*, 156 F.3d 1076, 1083–84 (10th Cir. 1998). Thus, "[a] regulation cannot be construed to mean what an agency intended but did not adequately express." *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1119 (10th Cir. 1977). Likewise, an agency cannot advance "a novel interpretation of its own regulation" in a civil enforcement action. *United States v. Magnesium Corp. of America*, 616 F.3d 1129, 1144 (10th Cir. 2010).

To determine whether the BLM's decision deprives Ovintiv of "fair notice," the Court must evaluate whether—prior to the Written Orders, INCs, and SDR Decision—Ovintiv could have understood with ascertainable certainty that Ovintiv may be responsible for plugging, abandoning, and reclaiming the Wells through the series of mergers and acquisitions. *See General Electric Co.*, 53 F.3d at 1329. Here, the answer is clearly "no."

As emphasized above, BLM applies the 2001 and 2024 regulations to the present action. Yet, at the time McMurry Oil acquired record title and allegedly accrued plug and abandonment obligations, the governing regulations were fundamentally different. *See* 43 C.F.R. § 3106.7-2 (1988). Under the 1988 version, the transferor remained responsible for lease obligations *until* BLM approved the transfer and that, following approval, the transferee became responsible for lease obligations. *Id.* Nothing in the regulation suggested that an assignor would remain indefinitely liable for future plugging and abandonment obligations after BLM approved the assignment. In fact, the Notice of Proposed Rulemaking even stated, "[i]n order to be *relieved* of

37

obligations under a lease, a lessee must assign all of the record title interest in the lease." 52 Fed. Reg. 22602 (June 12, 1987).

The 2001 rule materially changed that framework by introducing the concept that an assignor remained liable for obligations that had "accrued" before assignment approval, which included plug and abandonment obligations. BLM cannot retroactively apply later-adopted regulations to action taken under a materially different regulatory regime. *De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015) (regulations cannot apply retroactively absent a clear and unambiguous directive from Congress); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Regulated parties are entitled to rely on the legal consequences established by the regulations in place when they act. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1146 (10th Cir. 2016) ("[R]etroactive application of [a new regulation] to past conduct that affected persons cannot now change denies them fair notice of the law[.]"). Thus, Ovintiv was not on fair notice that BLM would subsequently adopt a more expansive theory of liability beyond those described in the plain and unambiguous language in the MLA.

Although BLM characterized the 2001 rule as "merely a clarification of existing law" and imposing no new obligations on lessees, the regulatory history demonstrates otherwise. 66 Fed. Reg. 1884 (Jan. 10, 2001). The Notice of Proposed Rulemaking for the 1988 regulations made clear that lessees were released from their lease obligations after a BLM-approved assignment, and nothing in the 1988 Final Rule suggested that BLM departed from this principle or imposed perpetual liability on a lessee after it assigned away its interests. *Compare* 52 Fed. Reg. 22569 (June 12, 1987) *with* 53 Fed. Reg. 17347 (May 16, 1988). In fact, BLM's only revision to Section 3106.7-2 after publishing the Notice of Proposed Rulemaking purported to *reduce* the liability of record title owners by "mak[ing] the sublessee responsible for all obligations under the rights

38

transferred to the sublessee." 53 Fed. Reg. 17347. Thus, the regulations in effect when McMurry held and assigned its lease interests provided that a lessee could be "relieved" of lease obligations by assigning away its entire record title interest, regardless of BLM's later characterization of the 2001 amendments.

Nor can BLM rely on the statement in the 2001 Final Rule, stating that federal leases "are subject to future regulations except to the extent such regulations are inconsistent with express lease provisions or the rights granted in the lease." 66 Fed. Reg. 1884 (Jan. 10, 2001). Again, this language was included after McMurry Oil owned and assigned record title in the Leases to WOGM, and BLM cannot show that extending liability to Ovintiv is consistent with the Lease terms.[10]

Finally, even if BLM could rely on the 2001 or 2024 regulations, BLM's liability theory still violates the fair notice doctrine. Nothing in the text of *any version* of the regulations extends lease liabilities to corporate successors of former lessees that never acquired lease interests and never assumed lease obligations. *See Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1119 (10th Cir. 1977) ("If the Secretary were to be permitted to interpret regulations by employing the unusual meaning of words, [regulated parties] would be deprived of fair notice of that which is expected of them in violation of their due process rights."). Indeed, AEC specifically structured the McMurry SPA to avoid acquiring any rights, interests, or liabilities associated with the Leases. *See supra* Section II. Based on the language of BLM's regulations and guidance materials, neither AEC nor any other reasonably prudent person would have understood that lease liabilities could follow a corporate lineage and attach to an entity that never owned an interest in the Leases. *Walker Stone*, 156 F.3d at 1083–84.

---

[10] BLM failed its obligation to provide all relevant documents in the AR, including copies of the Leases for Ovintiv to assess this argument, and for the Court to rule on this determination.

## V. THE SDR DECISION, INCS, AND WRITTEN ORDERS ARE ARBITRARY AND CAPRICIOUS.

In addition to the reasons articulated above, the SDR Decision, INCs, and Written Orders cannot withstand review under the APA. BLM failed to provide a reasoned explanation for its decision, ignored an important aspect of the problem, and departed from its own regulations, policies, and practices without adequate justification. *See Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (agency must articulate a reasoned explanation for its decision and cannot ignore an important aspect of the problem); *Utahns v. United States DOT*, 305 F.3d 1152, 1165 (10th Cir. 2002) (agencies have a clear "obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure"). Specifically, BLM: (1) ignored its established practice of exhausting remedies against the other RTOs and OROs; (2) failed to ensure adequate financial assurances from the entities that owned and operated the Wells; and (3) issued orders requiring conduct that Ovintiv has no legal ability to perform. Each of these failures independently renders the SDR Decision, INCs, and Written Orders arbitrary, capricious, and contrary to law.

### A. *BLM Failed to Engage in Reasoned Decisionmaking*

The SDR Decision, INCs, and Written Orders are arbitrary and capricious because BLM failed to articulate a reasoned basis for its conclusion that Ovintiv is liable for plugging, abandonment, and reclamation obligations associated with the Leases. Under the APA, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Qwest Corp. v. FCC*, 258 F.3d 1191, 1198 (10th Cir. 2001). Likewise, the agency "must make plain its course of inquiry, its analysis and its reasoning." *Olenhouse*, 42 F.3d at 1575. "If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible

40

to conclude the action was the product of reasoned decisionmaking, the reviewing court…may not simply affirm." *Id.*

Here, BLM's decisions do not satisfy these standards. The Orders and SDR Decision display the following unexplained, illogical syllogism: McMurry Oil was once a RTO of the Leases; Ovintiv is connected to McMurry Oil through a series of subsequent corporate transactions; therefore, Ovintiv is also a RTO and liable for the lease obligations. However, BLM never explained the legal rule that permits that result, identified the regulatory text supporting it, or reconciled its theories with the MLA. Thus, BLM's decisions are devoid of the "satisfactory explanation" required under the APA. *Qwest Corp.*, 258 F.3d at 1198.

BLM's failure to address key facts and evidence further underscores the arbitrary nature of its decisionmaking. Most notably, the SDR Decision omits any discussion of AEC's acquisition of McMurry Oil or the McMurry SPA, which specifically excludes rights and liabilities associated with the Leases. *See* WY_AR_001259—1278. If BLM believed that AEC (and eventually Ovintiv) still acquired those lease obligations, it was required to explain its conclusions. Instead of relying on relevant evidence from its case file, BLM based its liability determination on public filings about EnCana's reorganization as Ovintiv—documents that postdate the Written Orders, were not submitted by Ovintiv to BLM in connection with the Leases, and were presumably acquired through BLM's own investigation after-the-fact. *See Apache*, IBLA 2017-65 (Exhibit B) ("The case record maintained by BLM is the Government's only source of information about a lease and determines the identity of lessees responsible to the Secretary for compliance with terms of the lease.").

In short, BLM never explains how its regulations or the facts in the AR support Ovintiv's liability. Because the agency failed to articulate its reasoning, address contrary evidence, or

41

identify a valid legal basis for extending lease liability to a non-lessee, the SDR Decision, INCs, and Written Orders are arbitrary, capricious, and contrary to law.

### B. BLM Failed To Pursue Relief From Prior Lessees and Operators

Even if BLM could establish that Ovintiv inherited lease liabilities, which it cannot, the INCs, Written Orders, and SDR Decision are arbitrary and capricious because BLM ignored its own guidance regarding whom it should pursue for compliance. Rather than first exhausting remedies against the parties that actually held interests in and benefitted from the Leases, BLM bypassed numerous lessees and turned to the corporate successor of an entity that exited the chain of title in 2000 and was unaware that the Leases even existed.

Ovintiv recently learned that Manx, an actual RTO in the chain of title, has acknowledged responsibility for plugging and abandoning the Wells. *See* Exhibit D (Manx and BLM IBLA filings in *Manx Oil Corp.*, IBLA Docket No. 2024-155).[11] Corkill and Hot Springs also filed requests for state director review, and are thus existing entities—and actual prior RTO—with liability for the Wells. BLM Response at 3 (Exhibit D). Nonetheless, even if BLM simultaneously or subsequently pursued against other lessees, the regulations require BLM to pursue other RTOs/OROs *prior to* Ovintiv.

The IBLA has long recognized that "the primary responsibility" for plugging, abandonment, and reclamation work rests with the well operator, while the "ultimate responsibility remains with the record title owner of the lease." *Ralph G. Abbott*, 115 IBLA 343, 346 (1990); *Petroleum, Inc., Frank H. Gower Trust & Rex Monahan*, 161 IBLA 194, 220 (2004), aff'd, *Monahan v. U.S. Dep't of Interior*, No. 05-8068, 2007 U.S. App. LEXIS 24211, at *17 (10th Cir. Oct. 15, 2007); *Pitch Energy Corp.*, 169 IBLA 267, 274 (2006). Consistent with that principle,

---

[11] The Court can take judicial notice of filings before the agency. *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1295 n.1 (10th Cir. 2023).

BLM explained during the 2001 rulemaking that it would "first look to the current lessee for lease compliance," but it still reserved its rights against parties that "may have benefited from the well's existence." 66 Fed. Reg. 1898 (Jan. 10, 2001).

BLM's more recent guidance likewise establishes a clear hierarchy of enforcement. IM 2021-039 instructs BLM offices to pursue decommissioning obligations in the following order: (1) the current operator; (2) current RTOs and OROs with interests in the affected area or horizons; and (3) all other current and former RTOs and OROs on the lease. *See* IM 2021-039 (Exhibit A). The guidance reflects BLM's recognition that liability should first be pursued against parties with the most direct and recent connection to the lease and well.

Under that framework, BLM could not proceed against Ovintiv without first attempting to obtain compliance from the operators, OROs, and RTOs that held interests in the Leases after McMurry Oil transferred its lease interests. The AR confirms that numerous entities held record title and operating rights interests during the decades following McMurry Oil's ownership. Yet nothing in the record shows that BLM pursued those entities prior to issuing the INCs and Written Orders to Ovintiv. By disregarding its own enforcement hierarchy, BLM acted arbitrarily, capriciously, and contrary to its own regulations, longstanding practice, and guidance materials.

### C. BLM Failed To Ensure Adequate Bond Coverage

Further, BLM's decisions are arbitrary, capricious, and contrary to law because they attempt to shift plugging, abandonment, and reclamation obligations to Ovintiv despite BLM's noncompliance with its own obligation to ensure adequate bonding from the parties that actually owned and operated the Wells. BLM had a remedy to ensure that the operator complied with its obligations to adequately plug and abandon the Wells, but BLM failed to require adequate bonding from Terex.

43

The MLA requires the Secretary to confirm an adequate bond is in place to ensure "complete and timely reclamation" of the Lease. 30 U.S.C. § 187a. Under 43 C.F.R. §§ 3106.7-1, BLM requires sufficient bonding in connection with transfers of lease interests and changes in operatorship to secure compliance with lease obligations, including plugging, abandonment, and reclamation. In fact, 43 C.F.R. § 3106.7-1 prohibits BLM from approving a transfer of record title or of operating rights if the bond is insufficient. Importantly, BLM's statutory and regulatory duty is to require not a minimum bond, but a *sufficient* bond. Yet, BLM failed to ensure that the current and most recent owners and operators of the Wells (Terex, Hot Springs, Corkill and Manx) maintained adequate financial assurances to satisfy those obligations.

Rather than pursuing the parties that held record title, operating rights, or operatorship of the Wells, BLM seeks to impose liability on Ovintiv, a company that never owned any interest in the Leases and derived no benefit from the Wells. If BLM failed to obtain adequate financial assurances from the parties responsible for the Wells, that regulatory failure does not justify shifting the resulting costs to Ovintiv.

### D.  Compliance with BLM's Written Orders and INCs Would Require Ovintiv to Commit Trespass

Finally, the Orders should still be set aside because they require Ovintiv to perform acts that it has no legal authority to undertake. The record demonstrates that the surface estate is privately owned, Ovintiv possesses no surface use agreement or other contractual right of access, and the surface owner has expressly objected to unauthorized entry. As a result, compliance with the Orders would require Ovintiv to enter private property without legal authorization and expose itself to trespass liability.

BLM cannot lawfully compel a party to commit trespass in order to satisfy agency demands. Yet that is the practical effect of the INCs and Written Orders. Ovintiv has never owned

44

the Leases, never held operating rights, and never obtained any contractual or property interest authorizing access to the Wells. Moreover, because the Leases have terminated, Ovintiv cannot rely on any rights associated with a federal lessee's use of the surface estate. Any rights that may exist by virtue of the federal mineral estate belong to the United States, not to Ovintiv.

Nor does any APD or other regulatory approval provide Ovintiv with authority to enter the private surface estate. Ovintiv never acquired any interest in the APDs, the Wells, or the Leases that would authorize it to conduct plugging, abandonment, or reclamation operations. Accordingly, BLM has identified no legal basis by which Ovintiv could lawfully access the Wells and perform the work demanded by the Orders.

## CONCLUSION

Based on the foregoing, Ovintiv respectfully requests that the Court set aside the SDR Decision, INCs, and Written Orders pursuant to 5 U.S.C. § 706, declare that Ovintiv is not responsible for the plugging, abandonment, reclamation, or other obligations associated with the Wells and Leases at issue, and grant such further relief as the Court deems just and proper.

Dated: July 28, 2026                              Respectfully submitted,

                                                  **JONES WALKER LLP**

                                                  *[signature]*

                                                  WILLIAM E. SPARKS
                                                  Wyoming Bar No. 6-4501
                                                  10001 Woodloch Forest Drive, Ste. 350
                                                  The Woodlands, TX 77380
                                                  Telephone: (281) 296-4552
                                                  Facsimile: (281) 296-4575
                                                  wsparks@joneswalker.com

                                                  *Attorney for Ovintiv USA Inc.*

45

#112068292v12

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2026, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to other participants in this case.

_____
WILLIAM E. SPARKS

46

#112068292v12

## CERTIFICATE OF COMPLIANCE

This document complies with D. Wyo. L. Civ. R. 83.6(c) and the word limit of Fed. R. App. P. 32(a)(7)(B)(i), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 12,967 words, as determined by a word count using Microsoft Word.

_____

WILLIAM E. SPARKS

47